Anne Marie **GROZDANICH,** Plaintiff,

v.

**LEISURE HILLS HEALTH CENTER, INC., a Minnesota corporation, a/k/a Leisure Hills of Hibbing; St. Francis Health Center of Morris, Inc.; Mesabi Regional Medical Center, Inc., a Minnesota corporation, a/k/a University Medical Center–Mesabi; and John Parson, Defendants.**

Civ.No. 97–760 (RLE).

United States District Court,
D. Minnesota.

Sept. 30, 1998.

---

William James Mavity, Mavity & Assoc., Minneapolis, MN, for Plaintiff.

Michael M. Fluegel, Fluegel Helseth McLaughlin, Anderson & Brutlag, Morris, MN, for Defendants Leisure Hills Health Center, Inc., St. Francis Health Service of Morris, Inc.

Joseph John Roby, Jr., Laura J. Schacht, Johnson Killen Thibodeau & Seiler, Duluth, MN, for Defendant Mesabi Regional Medical Center, Inc.

1. St. Francis is the parent company of Leisure Hills, and the Plaintiff predicates St. Francis' liability solely upon the corporate relationship between the two entities. St. Francis has joined Leisure Hills' Summary Judgment Motion and, for the sake of convenience, we refer to both the parent and the subsidiary, since there are no liability issues which distinguish the two.

John Parson, Hibbing, MN, pro se.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate judge pursuant to the parties' consent, made in accordance with the provisions of Title 28 U.S.C. § 636(c), upon the Motion for Summary Judgment of Leisure Hills Health Center, Inc. ("Leisure Hills"), and St. Francis Health Service of Morris Inc. ("St.Francis"), and upon the Motion for Judgment on the Pleadings, or for Summary Judgment, of the University Medical Center–Mesabi's ("UMC–M") on the Plaintiff's claims against it, and on the Cross–Claim of Leisure Hills.

A Hearing on the Motions was conducted on March 5, 1998, at which time, the Plaintiff appeared by Pamela M. Miller, Esq., Leisure Hills appeared by Joseph J. Roby, Jr., Esq., UMC–M appeared by Michael M. Fluegel, Esq., and no appearance was made by, or on behalf of, the Defendant John Parson ("Parson").

For reasons which follow, the Motions are granted, in part, and denied, in part.

### II. *Factual and Procedural History*

This action arises from Parson's three acts of sexual assault upon the Plaintiff, which occurred on May 22, 1996, at a nursing care facility in Hibbing, Minnesota. At that time, Parson was a co-employee of the Plaintiff, and she asserts claims against her employer—Leisure Hills[1]—for sexual harassment, under Title VII of the Civil Rights Act of 1964, *Title 42 U.S.C. § 2000e et seq.,* the Minnesota Human Rights Act, *Minnesota Statutes Section 363.01 et seq.,* and under several common law theories.[2] She has also sued UMC–M, Parson's previous employer,

2. Parson has been sued for assertedly violating the Minnesota Human Rights Act, for allegedly assaulting and battering the Plaintiff, and for purportedly inflicting emotional distress upon her, either intentionally or negligently. He does not join the other Defendants' Motions for Summary Judgment.

under Minnesota common law, for its claimed role in failing to prevent the sexual assaults. Leisure Hills has filed a Cross–Claim against UMC–M, for common law indemnity, which is said to arise from a claimed violation of the common law duties it owes to Leisure Hills.

### A. Parson's Tenure at UMC–M.

From June of 1989 until August of 1995, Parson worked as a registered nurse at UMC–M, which is a hospital. On March 18, 1992, while on duty, Parson stroked and massaged T.M., a patient, in an objectionable, sexual manner. After learning of what happened, Captain James Mungai of the Salvation Army, who was T.M.'s advocate, reported the incident to the head nurse of medical surgical services, who relayed the information to Susan Jamar ("Jamar"). *Deposition of Susan C. Jamar of 6/16/97 at 35, 46, Affidavit of William Mavity, Ex. A.* As the Patient Care Manager, Jamar was Parson's supervisor. UMC–M investigated the patient complaint, but ultimately decided not to report the incident to either the police or to a social service agency, and elected not to discipline Parson. *Deposition of John E. Berland at 22–29, Mavity Aff., Ex. D.*

Over the next two years, Parson sexually assaulted several female UMC–M employees, and one female Medical Center patient. Several of these incidents, which involved unwelcome groping, massaging, and fondling of the employees, and the patient, were reported to UMC–M, and to Jamar. *Jamar Depo. of 6/16/27, Exs. 8–11, 13–28, 30; Mavity Aff., Exs. G and H; Affidavit of Sally Rikala, Mavity Aff., Ex. P.* As a result, in August of 1995, UMC–M forced Parson to resign.

Parson's resignation was effected pursuant to an agreement between himself, UMC–M, and the Minnesota Nurses Association, which was Parson's labor union. The Resignation Agreement recites that, because of the numerous accusations of sexual harassment and other misconduct, UMC–M believed that his termination was warranted, while Parson and his union believed that a discharge was "not necessarily warranted in these circumstances." *Resignation Agreement, Affidavit of Joseph Roby, Jr., Ex. G.* Under the terms of the Agreement, Parson voluntarily re-

signed, and he and his union agreed not to file any labor contract grievance relating to his employment at UMC–M. The Agreement also contained a confidentiality provision, which stated as follows:

> All parties agree to keep the matter confidential. Unless compelled to do so by subpoena or other lawful authority, no party shall discuss the facts of the matter with anyone, including other employers, not a party to this agreement. Notwithstanding the generality of this confidentiality provision, the Medical Center may discuss the facts of the matter with managers and with its attorney; Mr. Parson may discuss the facts of the matter with his spouse; and the Association may discuss the facts of the matter with its officers who have a need to know the facts of the matter, as well as with its attorney.

*Resignation Agreement.*

Pursuant to the Agreement, UMC–M would provide Parson with a letter of reference, signed by Jean Kovacovich, now Jean Yelle ("Yelle"), who served as UMC–M's Human Resources Manager, which stated as follows:

> The purpose of this letter is to verify employment of John C. Parson, R.N. He was employed from June 5, 1989 to August 24, 1995 on the Medical–Surgical Unit. Mr. Parson has not been the subject of any disciplinary action.

*Reference Letter of 8/24/95, Mavity Aff., Ex. F.*

On the day that Parson left his employment at the Medical Center, Jamar told him that she would give him a "good reference." *Jamar Depo. of 8/29/97 at 18, Mavity Aff., Ex. B.* Both Jamar and Yelle held a deep concern that Parson's pattern of sexual misconduct would reoccur in his employment in other health care environments. *Jamar Depo. of 6/16/97 at 50–51; Yelle Depo. at 73, 79, Mavity Aff., Ex. Q.*

### B. Leisure Hills' Retention of Parson.

Leisure Hills is a nursing home that shares responsibility over patients with UMC–M. The two facilities are parties to a "transfer agreement," that is designed to optimize the service of the individual pa-

tient's needs by allowing nursing home patients to be transferred to UMC–M for hospital care, while hospital patients are sent to Leisure Hills if they are in need of nursing home care. After he left UMC–M, Parson applied to work as a nurse for Leisure Hills.

Parson wrote on his Leisure Hills application that he had previously worked as a nurse for UMC–M. Alice Skaudis ("Skaudis"), who is Leisure Hills' Director of Nursing, interviewed Parson for the position of "Charge Nurse" in Unit 2 of the facility. A Charge Nurse is a registered nurse who is responsible for making clinical rounds with physicians, for overseeing the work of other nurses in the unit, and for making recommendations or giving advice concerning the hiring, disciplining, or the firing of other registered nurses. *Deposition of Alice Skaudis* at 32–33, *Mavity Aff., Ex.* C. Among the major duties and responsibilities, which are listed in the job description, are: to direct the day-to-day activities of the Staff Nurses; develop work assignments for Staff Nurses, delegate duties to the Staff Nurses; participate in determining the shift's staffing requirements; prepare employee performance evaluations; and make recommendations to the Director of Nursing concerning the discipline of subordinate employees, including a dismissal or transfer. *Charge Nurse Job Description, Miller Aff., Ex.* D.

Skaudis had noticed that Parson left his former nursing job in August of 1995, but she testified that she was not concerned by that fact, and did not wonder why he was no longer working at UMC–M. *Id.* at 36. By the end of the interview, which occurred in the latter part of December of 1995, Skaudis was impressed with Parson's qualifications. *Skaudis Depo.* at 46, *Second Affidavit of Michael M. Fluegel,*[3] *Ex.* B. In fact, she told Parson that he would probably be hired, "pending reference checks ***." *Id.* at 46–47.

On Friday, January 5, 1996, Skaudis telephoned Parson and offered him the job. She asked him if he could start work on the following Monday, which was the eighth of January. Parson accepted the offer. Later in the day, Skaudis telephoned Jamar at UMC–M to find out about Parson's employment history at the hospital. She has testified that she made the reference check after the employment offer and acceptance, because Parson's employment was to begin with a training period, during which he would have probationary status, and could be dismissed without notice, for any reason, and without cause. *Skaudis Depo.* at 95, 138, *Mavity Aff., Ex.* C. Skaudis has testified that she did not attempt to contact Jamar, with any contemplation that Parson's job offer could be revoked on account of anything that would be learned from Jamar, but because she wanted to know, from Parson's former supervisor, "what kind of nurse he was, working at the hospital, underneath [Jamar's] supervision," and "how he functioned at the hospital." *Id.* at 95.

Jamar could not be reached on January 5, but returned Skaudis' call on the following Monday afternoon, after Parson had begun his shift. When asked for an open-ended assessment of Parson, as a nurse, Jamar responded that Parson "was a very good clinical nurse," with "good assessment skills," and had "a good relationship with patients." *Id.* at 65–66. Jamar also told Parson's new employer that he had "some difficulty handling some employee issues." *Id.* at 66. Jamar did not elaborate upon Parson's difficulty with employee issues, and Skaudis did not ask for any further explanation of that comment. *Id.* at 68. Likewise, no explanation was offered, and none was requested, for Parson's resignation from his employment at UMC–M. *Id.* at 66–68. UMC–M and its personnel never informed Leisure Hills about Parson's history of on-the-job sexual misconduct.

C. *Parson's Period of Employment at Leisure Hills, Assaults upon the Plaintiff, and Aftermath.*

On January 8, 1996, Parson began working as a Charge Nurse in Unit 2. When Parson

---

**3.** Michael Fluegel, who serves as counsel for Leisure Hills, filed two Affidavits, both of which were entitled "Affidavit of Michael M. Fluegel." To avoid confusion, we cite them as the first and second Affidavits. What we refer to as his First Affidavit was sworn on January 9, 1998, and filed in support of Leisure Hills' Motion for Summary Judgment on the Plaintiff's claims against it. The second Affidavit was filed on February 4, 1998, in support of the Motion for Summary Judgment on UMC–M's Cross–Claims.

was hired, the Plaintiff was already employed by Leisure Hills, as a Staff Float Nurse. She worked from noon until eight in the evening, splitting her shift between Units 2 and 3. Accordingly, during the time that the Plaintiff worked in Unit 2, she was under Parson's authority.

Parson, like the Plaintiff and all Leisure Hills employees, was given a copy of the Leisure Hills Objectionable Behavior Policy on the first day of work. See, *Objectionable Behavior Policy, Affidavit of Betsy Moore, Ex.* 2. The Plaintiff was aware of the Objectionable Behavior Policy, and knew the appropriate authorities to contact should she be subject to sexual harassment, or any other form misconduct. Indeed, in March of 1996, both Parson and the Plaintiff attended an objectionable behavior seminar, which instructed the staff concerning Leisure Hills' policy against sexual harassment, the types of behavior that are considered harassment, and how to report such behavior. *Moore Aff.* ¶ 4. Pursuant to the Policy, Staff Nurses were to report sexual harassment to the Charge Nurse or, if the Charge Nurse was the perpetrator, then they were to report the behavior to the Director of Nursing. *Deposition of Anne Grozdanich at 64, First Affidavit of Michael M. Fluegel, Ex.* H.

On May 22, 1996, at approximately 1:00 o'clock p.m., the Plaintiff was working in Unit 2, and was attempting to perform a procedure on a patient that is referred to as a "catheter change." Experiencing difficulty with the procedure, and noticing that the patient was in pain, the Plaintiff called Parson, who was serving as her Charge Nurse, and who was in the hallway outside of the resident's room. Parson entered the room, and positioned himself behind the Plaintiff, ostensibly to help her change the patient's catheter. As the Plaintiff bent over the bed, she noticed that Parson started to breathe deeply through his nose, sniffing at her, while he put his left leg between hers. *Grozdanich Depo.* at 101–02, *Miller Aff., Ex.* F. He then placed his left hand on her buttocks, and caressed them, repeating: "It's okay, Anne." *Id.* at 102–05. The Plaintiff tried to avoid the contact but, because she had not completed the delicate catheterization procedure on the patient, she could not escape his grasp. *Id.* at 105–06. When the Plaintiff finished tending to the patient, Parson released her, and left the room.

The Plaintiff soon spoke to another Staff Nurse, Theresa Harling ("Harling"), about Parson's behavior. Having been told that Parson had touched the Plaintiff's buttocks, Harling advised the Plaintiff to " 'stay away from him.' " *Id.* at 108–09. The Plaintiff did not immediately report Parson's unwelcome physical contact to a superior, but she continued with her duties.

Later that afternoon, the Plaintiff sat at the Unit 2 nurses' desk in order to complete some patient charts. She was speaking with a resident's family member, about the resident's medical progress, when Parson approached, and sat down beside her. He slid closer, feigning interest in the contents of the resident's chart, and he placed his hand on the Plaintiff's right inner thigh. He slid his hand up her thigh, and he touched her vagina. *Id.* at 117–19. Harling was present at the nurses' station at the time, but she did not observe Parson touch the Plaintiff. The Plaintiff abruptly stood up from her chair.

Moments later, another Staff Nurse, Steve Forness ("Forness"), entered the nurses' station and told the Plaintiff that he had performed the clinical monitoring on one of the residents. Forness attempted to hand his monitoring notes to the Plaintiff, so that they might be transposed onto a chart, when Parson interjected: "that's Anne's job, she has to do the assessment and chart it herself." *Affidavit of Anne Marie Grozdanich* ¶ 5, *Miller Aff., Ex.* G.

The Plaintiff took some time to gather her monitoring equipment and brought it, as Parson had instructed, to the resident's room. This occurred sometime between 2:15 and 2:30 o'clock p.m. The patient was near death, and a curtain was drawn around his bed. She went behind the curtain and saw that Parson was standing at the head of the bed. She walked along the railing to the foot, and tried to check the patient from there, perhaps in an attempt avoid physical proximity to Parson. *Grozdanich Depo.* at 143. Parson told the Plaintiff that she had to check the patient's arms, and she moved up the

side of the bed to complete her assessment. Parson then grabbed her hips from behind, and pressed his body into hers, forcing her up against the bed rails so that she could not move. Through their clothing, the Plaintiff could feel Parson's erect penis pressed against her buttocks. Again, Parson told her: "It's okay, Anne; it's okay." *Grozdanich Depo.* at 145; *Grozdanich Aff.* ¶ 6. The Plaintiff broke free of Parson's grasp, ran down the hall, and hid in Unit 3's medication room, crying.

This third episode was the last time that Parson assaulted the Plaintiff. The Plaintiff has testified that, before and during the three occasions of objectionable sexual touching, Parson never verbally threatened her, and never made any statements that would indicate to the Plaintiff that her job would be affected by her submission to his advances. *Grozdanich Depo.* at 167. According to the Plaintiff's testimony, she did not subjectively believe that a failure to submit to Parson's touching would result in being fired, or would produce an unfavorable work schedule, nor did she believe that consenting to his conduct would result in any benefit to her employment relationship with Leisure Hills. *Id.* at 168.

In Unit 3's medication room, Jackie Cade, a co-worker, found the Plaintiff in tears, and suggested that she make a formal complaint about Parson's sexual assault. Late that afternoon, during the Plaintiff's Unit 3 shift, which commenced at 3:00 o'clock p.m., the Plaintiff related what happened that day to Betsy Moore ("Moore"), who was the Staff Development Coordinator. Moore urged the Plaintiff to reduce her allegations to writing, and she scheduled a meeting for 1:30 o'clock in the afternoon, on the following day, to be attended by the Plaintiff, Skaudis, and Michelle Javorina, the Administrator at Leisure Hills. She told the Plaintiff to report back to work in Unit 3. By then, Parson's Unit 2 shift had ended. On that same day, Moore contacted Javorina, Skaudis, and Assistant Administrator Walter Strasser ("Strasser"), to notify them of the Plaintiff's report.

The following morning, before meeting with the Plaintiff, Skaudis and Javorina conferred privately about the Plaintiff's accusa-

tion. They compared the Plaintiff's allegations with the standards imposed by the Objectionable Behavior Policy, and decided to put together an investigative team to determine what had happened. *Deposition of Michelle Javorina* at 185, *First Fluegel Aff., Ex.* E. The planned meeting convened, as scheduled, on May 23, 1996, at 1:30 o'clock p.m. The Plaintiff, Moore, Skaudis, and Javorina were present. They discussed the Plaintiff's charges, and the Plaintiff was told that the administration would conduct a complete investigation. The Plaintiff told them that she was too terrified to work with Parson, and Skaudis responded that the Plaintiff should simply report to work at 2:30 o'clock p.m., after Parson's shift, instead of at noon. *Grozdanich Aff.* ¶ 12. The Plaintiff was upset that her overall hours would be diminished because of Parson's misconduct, *id.* but the number of the Plaintiff's hours of work returned to normal shortly thereafter.

That afternoon, at 3:10 o'clock p.m., Moore, Skaudis, and Javorina met with Parson, whose shift had just ended. When confronted with the Plaintiff's accusations, Parson admitted only to having touched her on the shoulder once, and denied the Plaintiff's other allegations. *Deposition of John Parson* at 202–03, *First Fluegel Aff., Ex.* C. On May 24th, Javorina, Skaudis, and Moore interviewed Harling, to whom the Plaintiff had initially described Parson's first assault, and who was present at the nurses' station during the second encounter. Although she had not personally witnessed Parson touch the Plaintiff, she told the investigators that "something had definitely happened," and that she knew that Parson had done something to the Plaintiff. *Affidavit of Theresa Harling* ¶ 4, *Miller Aff., Ex.* H. Apparently, although the facts are somewhat obscure, no other employees were interviewed by the investigating team.

At the conclusion of the initial investigation, on May 24, 1996, the administration concluded that it did not have enough facts to determine, with certainty, whether the Plaintiff's allegations were true, and they settled upon Parson's formal reprimand. *Javorina Depo.* at 201. Javorina informed

the Plaintiff that the investigation was over and that, although the investigators believed her accusations to be credible, it was "[her] word against his," as there were no direct witnesses to the alleged harassment. *Grozdanich Depo.* at 173. Leisure Hills did, however, take two remedial actions. First, Javorina met with Parson, and personally issued a formal letter of reprimand. The letter stated, in pertinent part:

I investigated the alleged incident according to the official procedure established by the objectionable behavior policy. This included holding interviews with you, the complainant, and any potential witnesses. As a result of my investigation, I found the following:

That there were no witnesses who actually was present during the alleged events.

That the complainant honestly reported your actions as she perceived them.

That the complainant found your actions to be unwelcome, offensive, and extremely disturbing making it impossible for her to continue performing her job.

In view of these facts, I feel that your behavior was inappropriate and unprofessional.

\* \* \* \* \* \*

As a result, I am giving you this official reprimand, which will be placed in your personnel file.

I sincerely hope that this will be the end of the matter, and that there will be no further need for action in the future.

*Letter from Javorina to Parson of 5/24/96, Javorina Aff., Ex.* H. Second, the administration adjusted both Parson's and the Plaintiff's work schedules so that they would never simultaneously work in the same Unit.

That evening, the Plaintiff filed a criminal sexual assault complaint against Parson. On May 30, 1996, Officer Charles Bussey ("Bussey") telephoned Assistant Administrator Strasser to inquire about the Plaintiff's complaint. Bussey asked whether Leisure Hills' investigation determined that any criminal conduct occurred. Strasser replied that there was "perhaps" such conduct, but told the Officer to look at the letter of reprimand

for a precise summation of the investigation results. *Transcript of Taped Interview with Strasser, Hibbing Police Department Investigative File, Miller Aff., Ex.* E. Javorina permitted Bussey to interview Parson, during his work shift on May 31, 1996, in the Leisure Hills conference room. *Javorina Aff.* ¶ 6. The Hibbing Police continued to investigate by interviewing co-workers.

Although the Plaintiff never worked in the same Unit as Parson, from May 24, until Parson's subsequent suspension from employment on July 3, 1996, the two did have some work-related contact. From May 24 to June 9, their working hours overlapped, during the hours from noon until 3:00 o'clock p.m. During this period, Parson sometimes walked through the Plaintiff's Unit on his way to lunch, which, on occasion, caused her to hide in residents' rooms, or to lock herself in the medication room. *Grozdanich Aff.* ¶ 14. Additionally, Parson was present at the routine staff report meetings, which took place approximately twice weekly. *Grozdanich Depo.* at 88. The Plaintiff's new Charge Nurse, Wendy Walker, gave the Plaintiff permission to be absent at these meetings, if she felt uncomfortable in Parson's presence. *Id.* After the occurrences of May 22, 1996, Parson actually spoke to the Plaintiff' on only one occasion. In June, as the Plaintiff was walking past Parson, who was standing at the nurses' desk, he told her that it was time for the staff report meeting. *Id.* at 86–87. She did not respond.

Bussey met with Javorina on July 2, 1996, and informed her that criminal charges had been brought against Parson, and that he had essentially confessed to assaulting the Plaintiff. *Javorina Aff.* ¶ 7. The following day, Administrator Javorina suspended Parson without pay, and the Plaintiff was immediately informed of Parson's suspension. *Grozdanich Depo.* at 176–77. On August 5, 1996, Parson pleaded guilty to the fifth degree sexual assault of the Plaintiff. Leisure Hills terminated his employment on August 14, 1996.

In her Complaint, the Plaintiff brings seven Counts against Leisure Hills: 1) *quid pro quo* and hostile environment sexual harass-

ment under Title VII; 2) sexual harassment under the MHRA; 3) battery; 4) assault; 5) negligent hiring/retention/supervision; 6) intentional infliction of emotional distress; and 7) negligent infliction of emotional distress. In addition, for Counts VIII, IX, and X, the Plaintiff contends that UMC–M is liable for: 1) negligence *per se*, in that it violated a statutory duty, see, *Minnesota Statutes Section 626.557*, to report the abuse of T.M., a vulnerable adult; 2) negligent misrepresentation/recommendation; and 3) negligent failure to warn. The Defendants, except for Parson, move for Summary Judgment on each of these claims.

In its Answer, Leisure Hills filed a Cross–Claim against UMC–M, praying for a Judgment that the Hospital be held responsible for any sum for which Leisure Hills is found liable to the Plaintiff. In the Cross–Claim, Leisure Hills charges that UMC–M negligently failed to warn it about Parson's "dangerous propensities," which proximately caused any damages that it may have to pay the Plaintiff. UMC–M moves for Judgment on the Pleadings, or alternatively, for Summary Judgment on the Cross–Claim of Leisure Hills.

### III. *Discussion*

A. *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the non-moving party, and we have found no triable issue. *Lower Brule Sioux Tribe v. State of South Dakota,* 104 F.3d 1017, 1021 (8th Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the non-moving party. See, *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Dodd v. Runyon,* 114 F.3d 726, 729 (8th Cir.1997).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.,* supra at 256, 106 S.Ct. 2505; *Ivy v. Kimbrough,* 115 F.3d 550, 551 (8th Cir.1997); *Thomas v. Runyon,* 108 F.3d 957, 959 (8th Cir.1997). Moreover, the movant is entitled to Summary Judgment where the non-moving party has failed "to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. 2548; see also, *Greer v. Shoop,* 141 F.3d 824, 826 (8th Cir.1998); *Mayard v. Hopwood,* 105 F.3d 1226, 1228 (8th Cir.1997). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.,* 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross,* 992 F.2d 162, 163 (8th Cir.1993).

B. *Legal Analysis.* Leisure Hills and UMC–M both argue that there are no genuine issues of material fact, with respect to any of the issues involved in the Plaintiff's respective claims against them, and UMC–M also argues that Leisure Hills' Cross–Claim must fail as a matter of law. Under the preceding standard, the Court considers each of the three Motions for Summary Judgment.

1. *The Plaintiff's Claims against Leisure Hills.* The Plaintiff maintains that Leisure Hills is vicariously liable for Parson's sexual assault, under both Federal and State law,

and is liable for its own negligence in hiring, retaining, and supervising Parson.

a. *Sexual Harassment under Title VII.* Here, the Plaintiff argues that Leisure Hills is liable for both *quid pro quo threats,* and for creating a hostile work environment which amounted to sexual harassment. Both are prohibited by Title VII, which states that it is "an unlawful employment practice for an employer *** to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's *** sex." *Title 42 U.S.C. § 2000e–2(a)(1).*

i. *Standard of Review.* Very recently, three months after oral argument on this matter, the Supreme Court issued fresh guidance in determining whether an employer is vicariously liable for the sexual harassment of a supervisor. In *Faragher v. City of Boca Raton,* —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and its companion case, *Burlington Indus. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Court held that an employer is subject to vicarious liability to a victimized employee, under Title VII, for actionable sexual harassment by a supervisor with immediate—or successively higher—authority over the employee. *Burlington Indus. v. Ellerth,* supra at 2270; *Faragher v. City of Boca Raton,* supra at 2292–93. If no tangible employment action is taken against the employee, such as a discharge, a demotion, or an undesirable work reassignment, "a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence," which must be established by "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus. v. Ellerth,* supra at 2270; *Faragher v. City of Boca Raton,* supra at 2293.

These holdings have displaced the previous dichotomy of employer liability, which had previously existed between *quid pro quo* and hostile working environment claims, as was recognized by the Eighth and other Circuits. Under the formerly accepted analysis, if a *quid pro quo* claim was established, the employer was subject to vicarious liability. See, *Todd v. Ortho Biotech, Inc.,* 138 F.3d 733, 737 (8th Cir.1998), pet. for cert. filed, —— U.S. ——, 119 S.Ct. 33, —— L.Ed.2d —— (1998) (No. 98–155); *Davis v. Sioux City,* 115 F.3d 1365, 1367 (8th Cir.1997). A successful hostile environment claim, under the former interpretation of Title VII, would not automatically make the employer liable, unless the employer had engaged in some degree of culpable behavior, such as if the employer knew, or should have known, of the harassment, and failed to take appropriate remedial action. *Id.* at 1369. Now, with the vicarious liability principles announced in *Faragher* and *Ellerth* in place, the terms *quid pro quo,* and hostile environment, remain useful only for the "threshold question of whether a plaintiff can prove discrimination in violation of Title VII." *Burlington Indus. v. Ellerth,* supra at 2265.

A *prima facie* case of *quid pro quo* sexual harassment will be established if a plaintiff shows that: 1) she was a member of a protected class; 2) she was subject to unwelcome sexual advances or requests for sexual favors; 3) the harassment was based on sex; and 4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits, or her refusal to submit resulted in a tangible job detriment. *Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 473 (8th Cir.1995), citing *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 186 (6th Cir.1992), cert. denied, 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992). A number of Courts have held that, under the *quid pro quo* theory, an unfulfilled threat of an adverse employment action is insufficient to state a claim, as the harassment must result in a tangible job detriment if it is to be actionable. See, *Webb v. Cardiothoracic Surgery Associates of North Texas, P.A.,* 139 F.3d 532, 539 (5th Cir.1998); *Gallagher v. Delaney,* 139 F.3d 338, 346 (2nd Cir.1998); *Gary v. Long,* 59 F.3d 1391, 1396 (D.C.Cir. 1995), cert. denied, 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995); *Jones v. Clinton,* 990 F.Supp. 657, 669 (E.D.Ark.1998);

but see, *Jansen v. Packaging Corp. of America*, 123 F.3d 490, 499 (7th Cir.1997) (*en banc*) (a "clear and unambiguous" *quid pro quo* threat that "clearly conditions concrete job benefits or detriments on compliance with sexual demands" can constitute an actionable claim "even if the threat remains unfulfilled,"), aff'd. on other grounds *sub nom., Burlington Indus. v. Ellerth,* supra, and, cert. denied, —— U.S. ——, 118 S.Ct. 2365, 141 L.Ed.2d 734 (1998); *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1297 (3rd Cir.1997) (same).

▮▮ Because Title VII is not a "general civility code," *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201, (1998), sexual harassment must be "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment'" before it can be said to create a hostile environment, under the Statute. *Faragher v. City of Boca Raton,* supra at 2283 [alteration in original], quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Therefore, a plaintiff claiming hostile environment harassment "'must show both that the offending conduct created an objectively hostile environment and that she subjectively perceived her working conditions as abusive.'" *Rorie v. United Parcel Serv., Inc.,* 151 F.3d 757, 761 (8th Cir.1998), quoting *Hathaway v. Runyon,* 132 F.3d 1214, 1221 (8th Cir.1997). In other words, there is a hostile work environment where "sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Cram v. Lamson & Sessions Co.,* supra at 474, quoting *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1013 (8th Cir.1988).

▮▮ To assess whether the harassment is sufficiently severe, or pervasive, to alter the conditions of employment, the Court must look to the totality of the circumstances. See, *Nichols v. American Nat'l Ins. Co.,* 154 F.3d 875, 886 (8th Cir.1998), quoting *Faragher v. City of Boca Raton,* supra at 2283; *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 F.3d 1316, 1327 (8th Cir.

1994); *Callanan v. Runyun,* 903 F.Supp. 1285, 1298 (D.Minn.1994) ("When viewed in the context of the two-year period in which these events occurred, it may not be legitimately said that the objectionable conduct permeated the workplace or was so serious or pervasive as would draw a reasonable person to conclude that the work environment to which [the claimant] was exposed was hostile or abusive."), aff'd, 75 F.3d 1293, 1296 (8th Cir.1996). In particular, the Court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The Supreme Court has taken pains to emphasize that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.,* supra at 1003, quoting *Harris v. Forklift Sys., Inc.,* supra at 23, 114 S.Ct. 367. Generally, for sexual harassment to be sufficiently severe, or pervasive, to create a hostile working environment, "more than a few isolated incidents are required." *Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d 568, 573 (8th Cir.1997); see also, *Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 358 (8th Cir.1997).

#### ii. *Legal Analysis.*

▮ (A) *Quid Pro Quo Harassment.* The Plaintiff's *quid pro quo* theory is, by far, the weaker of the two Title VII claims. Leisure Hills does not contest the existence of the first three elements of *quid pro quo* harassment, and recognizes that she was a member of a protected class, and was subject to unwelcome sexual advances on the basis of her sex. Rather, Leisure Hills argues that there is no issue of material fact on the fourth element of her claim, as the Plaintiff's submission to Parson's unwelcome advances was an not an express or implied condition for receiving any job benefits, nor did her refusal to submit to that conduct result in a tangible job detriment.

There is no suggestion, and the Plaintiff does not argue, that her refusal to submit to Parson's advances resulted in an actual tangible job detriment, in the form of some adverse employment action. Under the analysis of several Courts, that circumstance would constitute a critical failing in a *quid pro quo* claim. See, *Webb v. Cardiothoracic Surgery Associates of North Texas, P.A.,* supra at 539; *Gallagher v. Delaney,* supra at 346; *Gary v. Long,* supra at 1396; *Jones v. Clinton,* supra at 669. We cannot overlook, however, that our Court of Appeals' recitation of the fourth *quid pro quo* element is in the disjunctive; namely that a plaintiff's "submission to the unwelcome advances was an express or implied condition for receiving job benefits, *or* her refusal to submit resulted in a tangible job detriment." *Cram v. Lamson & Sessions Co.,* supra at 473 [emphasis added]. Reading the word "or" to have grammatical effect, the fourth element of a *prima facie* case could be satisfied by unwelcome sexual advances combined with either a prospective threat of adverse employment consequences, or the occurrence of a tangible job detriment, as a result of the employee's refusal to submit.

Such a reading, although plausible, is not compatible with the Supreme Court's recent discussion of the topic. The *Ellerth* decision strongly suggests that unwelcome sexual advances, which are accompanied by an unfulfilled threat of tangible, adverse employment consequences, should be analyzed only as a form of hostile work environment harassment. Of course, both *Faragher* and *Ellerth* hold that the existence of "tangible job consequences" are taken out of the *prima facie* case of sexual harassment, and should be used to determine whether a defendant will be permitted to assert an affirmative defense. See, *Burlington Indus.,*

*Inc. v. Ellerth,* supra at 2257 ("[n]o affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment"). Nevertheless, the *Ellerth* Court was presented with a Petition for Certiorari that posed the question of whether a *quid pro quo* claim could be stated under Title VII "where the plaintiff employee has neither submitted to the sexual advances of the alleged harasser nor suffered any tangible effects on the compensation, terms, conditions or privileges of employment as a consequence of a refusal to submit to those advances?" *Id.* at 2264. While, as noted, the Court found the distinction between *quid pro quo,* and hostile environment, to be immaterial to the issue of the vicarious liability of an employer, it still observed that, "[b]ecause Ellerth's claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." *Id.* at 2265, citing *Oncale v. Sundowner Servs., Inc.,* supra at 1002–03. Although this statement may be properly regarded as dictum, because it was unnecessary to the Court's decision, we believe that it is plainly reflective of the Court's view that allegations, such as the Plaintiff's, should be directed toward the hostile environment analysis, and are not be treated under the framework of a *quid pro quo* claim. See, *Ponticelli v. Zurich American Ins. Group,* 16 F.Supp.2d 414, 428 (S.D.N.Y. 1998) (because supervisor "did not carry out any of the alleged threats, *** claim must be characterized as a hostile work environment, and not a *quid pro quo,* claim"), citing *Burlington Indus., Inc. v. Ellerth,* supra at 2265.[4]

4. Our view in this respect appears to be consistent with our Court of Appeals' most recent ruling on the issue, in *Newton v. Cadwell Laboratories,* 156 F.3d 880 (8th Cir.1998), where the Court reversed the Trial Court, which had construed the plaintiff's claim as a *quid pro quo* action, had found no evidence of a detrimental employment decision, and had rejected the plaintiff's sexual harassment claim. As the Court explained:

Although [the plaintiff] placed a quid pro quo label on her claim, [she] pleaded in her com-

plaint that [her supervisor] continued to make unwelcome and uninvited advances toward [her] after their affair ended. Because [her] claim does not involve either fulfilled threats or other detrimental employment action resulting from her refusal to submit to [her supervisor's] sexual overtures, [the Plaintiff's] claim "should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." *Ellerth,* 118 S.Ct. at 2265. In light of the existing law of this circuit, the district court understandably

Assuming, for the sake of argument, that an unfulfilled, implied threat could form the basis of a *quid pro quo* claim, there is no colorable evidence that such a threat was made against the Plaintiff. She asserts that Parson's three sexual assaults, on May 22, 1996, carried with them the implied threat of a job detriment—namely her termination from employment—if she did not passively submit to his advances. The only words that Parson is said to have uttered, however, when he assertedly assaulted the Plaintiff, were contained in the repeated advisory: "It's okay." In her Memorandum, the Plaintiff argues that, taken in context, these words are terms of coercion, which implied that the Plaintiff's refusal to submit to Parson's advances would result in retaliation and, perhaps, her dismissal.

By contrast, in *Cram v. Lamson & Sessions Co.*, supra at 474, the supervisor made the statement: "I'll get you for this," after a quarrel with the plaintiff, who was his subordinate, and who had previously ended their consensual romantic relationship. The Court found this statement insufficient to link a threatened job detriment, and the supervisor's asserted *quid pro quo* demands. The Court reasoned:

> Rogers made this statement outside of work, as a result of a nonwork-related quarrel. The statement makes no reference to [the employer] or Cram's job. There is no implication that he intended to "get her" for her personal rejection of him by interfering with her work at [the employer].

*Cram v. Lamson & Sessions Co.*, supra at 474.

This Court is presented with a fairly similar set of circumstances. Here, Parson's statements and actions were made in a work setting, while the Plaintiff was attending to her duties. However, there was no threat, explicit or implicit, carried in the words "it's okay," much less a threat to the terms and conditions of the Plaintiff's employment. The Plaintiff's deposition testimony indicates that she did not consider Parson's statements to be verbal threats, and that her failure to immediately object to his advances was not prompted by a fear of adverse job consequences. *Grozdanich Depo.* at 167–68. Accordingly, irrespective of the existence of a tangible job detriment, the Plaintiff does not have a viable claim for *quid pro quo* sexual harassment.

(B) *Hostile Environment Harassment.*

(I) *Severity and Pervasiveness.*

The Plaintiff claims that Parson's three acts of sexual assault, which occurred over a two-hour period, were "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Faragher v. City of Boca Raton*, supra at 2283, quoting *Meritor Savings Bank, FSB v. Vinson*, supra at 67, 106 S.Ct. 2399. In assessing the totality of the Plaintiff's circumstances, which includes the time before and after she endured Parson's attacks, we keep in mind the general principle that, in order for acts of sexual harassment to precipitate a hostile environment, "more than a few isolated incidents are required." *Kimzey v. Wal–Mart Stores, Inc.*, supra at 573; see also, *Lam v. Curators of Univ. of Mo.*, 122 F.3d 654, 656–57 (8th Cir.1997) (single exposure to offensive videotape not severe or pervasive enough to cause hostile environment). We are also mindful, however, of those exceptional cases in which a single episode of sexual harassment, such as a sexual assault, proved to be sufficient to state a claim of a hostile work environment

categorized [the Plaintiff's] claim as a quid pro quo sexual harassment claim, rejected the claim because [she] failed to show her refusal to submit resulted in a detrimental employment action, and did not decide whether [she] was subjected to severe or pervasive sexual harassment sufficient to constitute a hostile work environment. See *Cram*, 49 F.3d at 473–74. Although we agree with the district court that the summary judgment record does not establish [the plaintiff] suffered any kind of

detrimental employment action related to her rejection of [her supervisor's] advances, this is no longer controlling on the issue of [the defendant's] vicarious liability after *Ellerth*. Rather, the absence of a detrimental employment action allows [the defendant] to present an affirmative defense if [the plaintiff] can show [her supervisor's] conduct was sufficient to create a hostile work environment. See *Ellerth*, 118 S.Ct. at 2265, 2270.

sexual harassment. See, *Todd v. Ortho Biotech, Inc.,* supra at 736 (single attempted rape at national sales meeting held sufficiently severe misconduct to be actionable); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2nd Cir.1995) ("even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability"); *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 464 (7th Cir.1990) (single incident where supervisor picked up plaintiff and forced her face against his crotch impliedly considered to create hostile environment); *Fall v. Indiana University Bd. of Trustees,* 12 F.Supp.2d 870, 879 (N.D.Ind.1998) (single assault, involving a groping of intimate areas, may create hostile environment); cf., *Jones v. Clinton,* supra at 675 (suggesting that a "sexual assault" may be deemed sufficient to state claim of hostile work environment), citing *Crisonino v. New York City Housing Auth.,* 985 F.Supp. 385 (S.D.N.Y.1997).

Indeed, the Equal Employment Opportunity Commission has stated its position, that the forced touching of an intimate body part, akin to Parson's assaults on the Plaintiff, creates a presumptively hostile working environment:

> The [EEOC] will presume that the unwelcome intentional touching of a charging party's intimate body parts is sufficiently offensive to alter the conditions of her employment and constitute a violation of Title VII. More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment. If an employee's supervisor sexually touches that employee, the [EEOC] normally would find a violation.

*EEOC Policy Guidance on Sexual Harassment,* 8 *Fair Employment Practice Manual* (BNA) 405:6691 (March 19, 1990).

■ In our view, the line of demarcation which separates "isolated incidents" of harassment from the purview of Title VII, must be drawn around actual sexual assaults, involving the unwanted touching or groping of a victim's intimate body parts. A single sexual assault has a far greater potential to adversely alter the work environment, and with greater permanence, than would an offensive verbal remark, or a series of such remarks. Therefore, although the period of harassing conduct in this case was short-lived, the three sexual assaults were sufficiently offensive, and so dominantly repugnant to raise a genuine issue of fact as to whether the harassment was sufficiently severe to be actionable under a hostile environment theory. A reasonable Jury, in assessing the totality of the circumstances which surrounded the incidents involving the Plaintiff and Parson, could properly find that the Plaintiff was subjected to a hostile work environment, in violation of Title VII. See, *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir.1998) (once there is evidence of improper conduct and subjective offense, determination of whether conduct rises to level required for hostile environment is largely in the Jury's hands).

(II) *Parson's Employer Status.*

■ Next, we must determine whether there is a material issue of fact concerning Parson's supervisory status, vis á vis the Plaintiff. Under *Faragher* and *Ellerth,* if Parson is a supervisor, then Leisure Hills is vicariously liable for his discriminatory conduct, subject only to Leisure Hill's two-part affirmative defense. Of course, if Parson was not a supervisor, and was not assisted in the accomplishment of the alleged hostile environment sexual harassment, by the presence of an agency relationship with his employer, then different considerations would apply. Although neither of these Supreme Court decisions speaks directly to this issue, the presumably still-valid law of this Circuit holds that, if Parson and the Plaintiff were merely co-employees, Leisure Hills is liable only if it "knew or should have known of the harassment and failed to take immediate and appropriate action." *Quick v. Donaldson Co.,* 90 F.3d 1372, 1378 (8th Cir.1996), citing *Burns v. McGregor Electronic Indus., Inc.,* 989 F.2d 959, 966 (8th Cir.1993).

At the outset, we note that Leisure Hills' insistence, that Parson was not a supervisor, was expressed as a defense to vicarious liability in the context of the Plaintiff's *quid pro*

*quo* claim. Our rejection of the Plaintiff's *quid pro quo* theory, plus the Supreme Court's new guidance, have exalted Parson's asserted supervisory status into the forefront of the Plaintiff's hostile environment claim against Leisure Hills. Because Leisure Hills' Motion was briefed, and argued, before the Supreme Court's decisions in *Faragher* and *Ellerth,* we will consider its argument, that Parson was not a supervisor, to be directed at the critical distinction, in the hostile environment milieu, that has now been drawn by *Faragher* and *Ellerth.*

In delineating an employer's vicarious liability under Title VII, for the actions of its subordinates, Congress defined the term "employer" to include "agents." In *Meritor Savings Bank, FSB v. Vinson,* supra at 72, 106 S.Ct. 2399, the Supreme Court held, without elaboration, that, in ascertaining employer liability, agency principles controlled. As noted, *Faragher* and *Ellerth* have since refined that proposition by deciding that, under the Federal common law of agency, an employer is vicariously liable for the hostile environment harassment of a "supervisor."

We would expect Leisure Hills to argue that the dispositive distinction between a "supervisor," and a co-worker, should be drawn along the same contours that had been employed in the context of *quid pro quo* harassment. In this respect, Leisure Hills urges the Court to follow *Highlander v. K.F.C. Nat'l Mgmt. Co.,* 805 F.2d 644, 648 (6th Cir.1986), which held that, for purposes of imputing sexual harassment liability to the employer, "supervisory employees" are those that "hav[e] plenary authority over hiring, advancement, dismissal and discipline under the theory of respondeat superior." Along those lines, Leisure Hills also suggests that the Court employ the approach taken by Judge Coffey in his concurrence in *Jansen v. Packaging Corp. of America,* supra, by borrowing from the definition of "supervisor" as employed in National Labor Relations Act ("NLRA"). Judge Coffey reasoned:

> Our cases interpreting the statutory definition of "supervisor" in the National Labor Relations Act, 29 U.S.C. § 152(11) ("NLRA"), have examined the meaning of this term in some detail and recognized that "[s]upervision in the elementary sense of directing another's work" does not suffice to make an employee a "supervisor." Rather, a supervisor "must have authority over another's job tenure and other conditions of employment." The need to define "supervisor" with precision—and to provide some meaningful, common-sense limitations on who may be deemed a "supervisor"—is even more imperative in cases of sexual harassment because Title VII, unlike the NLRA, fails to provide a statutory definition of this term.

*Jansen v. Packaging Corp of America,* supra at 527 (Coffey, J., concurring) quoting *N.L.R.B. v. Res–Care, Inc.,* 705 F.2d 1461 (7th Cir.1983), and citing *N.L.R.B. v. Winnebago Television Corp.,* 75 F.3d 1208, 1213 (7th Cir.1996) ("The test of a supervisor under § 152(11) is whether his judgment was dispositive in personnel decisions."); but cf., *N.L.R.B. v. Broyhill Co.,* 514 F.2d 655, 658 (8th Cir.1975) (under NLRA, foreman who doled out assignments, and made recommendations for promotion, and discipline, properly considered "supervisor"); *Caremore, Inc. v. N.L.R.B.,* 129 F.3d 365, 370 (6th Cir.1997) (under NLRA, ability to recommend personnel actions held sufficient to confer supervisory status).

Under the reasoning of *Highlander,* and that urged by the concurrence in *Jansen,* Parson would not meet the definition of "supervisor." Although Parson was clearly authorized to manage and direct the Staff Nurses' day-to-day activities, it is undisputed that he could not make significant personnel decisions such as hiring, firing, promotion, wage increase, or discipline. He was authorized and directed to evaluate the performance of Staff Nurses in order to make recommendations to the Director of Nursing, concerning the hiring, disciplining, and firing of Staff Nurses. Cf., *Pfau v. Reed,* 125 F.3d 927, 936–37 (5th Cir.1997) (first-line supervisor, who "could only recommend that employees receive awards or be subject to disciplinary action" was not employer's agent within meaning of Title VII), cert. denied, —— U.S. ——, 119 S.Ct. 32, 142 L.Ed.2d 24 (1998).

There is a more indulgent line of case authority which, prior to *Faragher* and *Ellerth*, maintained that a low-level superior, who retained something less than plenary authority over hiring and firing, could be considered a "supervisor" such that an employer would be vicariously liable for his acts of sexual harassment. See, e.g., *Canutillo Ind. Sch. Dist. v. Leija*, 101 F.3d 393, 401–02 (5th Cir.1996) (the agent " 'need not have ultimate authority to hire or fire to qualify as an employer, as long as he or she has significant input into such personnel decisions.' "), cert. denied, —— U.S. ——, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997), quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir. 1989), modified, 900 F.2d 27 (4th Cir.1990); *Savino v. C.P. Hall Co.*, 988 F.Supp. 1171, 1185 (N.D.Ill.1997) (manager who had authority to only recommend termination, could be supervisor under Title VII, because apparent authority existed); *Saville v. Houston County Healthcare Auth.*, 852 F.Supp. 1512, 1527 (M.D.Ala.1994) ("A supervisor need not be 'high in the business structure' or have 'the authority to hire, fire, or promote' be considered an agent" under Title VII), quoting *Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052, 1069 (M.D.Ala.1990); see also, *Meritor Savings Bank, FSB v. Vinson*, supra at 76, 106 S.Ct. 2399 (Marshall, J., concurring) ("A supervisor's responsibilities do not begin and end with the power to hire, fire, and discipline employees, or with the power to recommend such actions," but contemplate "the day-to-day supervision of the work environment and with ensuring a safe, productive workplace.").

Upon a close reading of the *Faragher* decision, it is evident that the Supreme Court views the term "supervisor" as more expansive than as merely including those employees whose opinions are dispositive on hiring, firing, and promotion. The *Faragher* case involved a claim by a lifeguard, which was based upon the lewd remarks, and the uninvited offensive touching, that had been committed by two of her superiors. One of those superiors, the Chief of the Marine Safety Division, had authority over hiring and firing lifeguards—subject to the approval of higher management—and supervised all aspects of the lifeguards' work. The other was a marine training captain, who was only responsible for making the lifeguards' daily assignments, and for supervising their work and fitness training but, apparently, without the authority to hire and fire. *Faragher v. City of Boca Raton*, supra at 2279–80, citing decision below, 864 F.Supp. 1552, 1563–64 (S.D.Fla.1994).[5] In reversing the Court of Appeals, and remanding the case to the District Court to reinstate judgment in favor of the plaintiff, the Supreme Court considered both employees to be "supervisors," and held the City liable for the hostile working environment that they had created. *Id.* at 2293.

The Court's reasoning was premised, at least in part, upon a recognition "that supervisors have special authority enhancing their capacity to harass, and that the employer can guard against their misbehavior more easily because their numbers are by definition fewer than the numbers of regular employees." *Id.* at 2289–90. The Court also explained "that in implementing Title VII it makes sense to hold an employer vicariously liable

**5.** The District Court made the following factual determination of the employees' respective supervisory responsibilities:

> The Court has found that Terry, Silverman, and Gordon were all supervisors of the City's ocean lifeguards. In making this determination, the Court has considered all of the testimony related to these individuals' duties and authority toward the lifeguards. As Marine Safety Chief, Terry had the authority to supervise all aspects of the lifeguards' work assignments, to conduct counseling and oral reprimands and place reports of such disciplinary actions in the lifeguards' personnel files. Terry also interviewed and selected new lifeguards, subject to approval by higher management. As lieutenant and later, as captain,

> Silverman had supervisory responsibility over the lifeguards' work assignments and staffing of shifts, and supervision of their physical fitness routines. *** Moreover, the paramilitary configuration of the Marine Safety Section constitutes evidence of a clear chain of command from lieutenants to captains to the chief. Through this chain of command, the City vested in the Marine Safety supervisors both administrative and disciplinary authority over the lifeguards.

*Faragher v. City of Boca Raton*, 864 F.Supp. 1552, 1563–64 (S.D.Fla.1994), rev'd in part, 111 F.3d 1530 (11th Cir.1997) (*en banc*), judgment reinstated, —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

for some tortious conduct of a supervisor made possible by abuse of his supervisory authority," because the harasser's "supervisory authority" over the victim prevents her from curbing the abusive conduct, and because "employers have a greater opportunity and incentive to screen [the supervisors], train them, and monitor their performance." *Id.* at 2290–91.

Although the Court did not offer a bright-line to distinguish between a "supervisor," and a mere ministerial superior, the Court's treatment of Faragher's claim provides instructive guidance to this Court, in squarely presenting that question. Necessarily, in considering an employee, whose "supervisory" authority extended only to the management of his subordinates' daily activities and physical fitness routines, to qualify as a "supervisor," so as to impute Title VII to the "supervisor's" employer, the Court did not consider the power to hire and fire to be dispositive. Indeed, the most senior supervisor, whose conduct was at issue in *Faragher,* as well as the supervisor in *Ellerth,* did not have plenary authority to render hiring and promotion decisions, but was required to secure the approval of higher management for those purposes. See, *id.* at 2279; *Burlington Indus., Inc. v. Ellerth,* supra at 2262.

The disutility of drawing any distinction between supervisors who manage their subordinates' daily activities, but who can only recommend significant personnel decisions, and supervisors who have plenary authority over all such matters, underscores the Supreme Court's holdings in *Faragher* and *Ellerth.* A supervisor who sexually harasses an employee, even though he holds no dispositive say over that employee's employment status, is furthered in his capacity to harass by the power that he wields over the employee, see, *Faragher v. City of Boca Raton,* supra at 2289–90; *Burlington Indus., Inc. v. Ellerth,* supra at 2269, and the employer can and should guard against the supervisor's abuse of the very authority that the employer vested in its managers. To draw the distinction, that is urged by Leisure Hills, would facilitate an employer to effectively insulate itself from the application of *Faragher,* and *Ellerth,* simply by directing all critical personnel decisions to be effected by a personnel department, which may have no direct, and only infrequent contact with the employee subject to the harassment. According to Leisure Hills, only the Director of Nursing, and those superior to her, should be considered "supervisors," even though the routine exercise of managerial authority over Staff Nurses is carried out by the nurses immediate superiors. Such a limited construction of the term would do violence to the rationale in *Faragher,* for neither of the harassers there held unlimited authority over the subordinate's personnel decisions, but simply held " 'virtually unchecked authority' " over their day-to-day activities which, when abused, subjected the employer to Title VII liability.

Here, it is undisputed that Parson was the Plaintiff's first line supervisor, while she worked in his Unit, and he maintained the authority to control her daily activities, as well as to recommend that she be subject to a full range of employee discipline. Further, there is evidence in the Record, which we take as true for these purposes, that Parson actually used his supervisory status to allow him to harass the Plaintiff by sending her to a resident's room, so as to be isolated from others, in order that he might physically assault her there. In our view, the evidence is sufficient to support a finding, by a reasonable Juror, that Parson acted as the Plaintiff's supervisor, such that Leisure Hills could be held liable for his harassment of her.

(III) *Affirmative Defense.* In order to honor the concept of *stare decisis,* and to preserve *Meritor*'s holding that an employer is not "automatically" liable for the acts of harassment of a supervisor, the Supreme Court created an affirmative defense which could shield the employer from such liability. If no "tangible employment action, such as discharge, demotion, or undesirable reassignment," is taken, an employer can avoid liability by proving, by a preponderance of the evidence: (a) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that the plaintiff employee unreasonably failed to take advantage of the preventive or corrective

opportunities offered by the employer, or otherwise failed to avoid harm. *Faragher v. City of Boca Raton*, supra at 2292–93; *Burlington Indus., Inc. v. Ellerth*, supra at 2270.

Because these decisions post-dated the Motions for Summary Judgment, Leisure Hills has neither pleaded, nor argued, this potential affirmative defense. In the interest of fairness, therefore, we will allow the Defendants to interpose an affirmative defense to liability, as formulated by the Supreme Court. See, *Rule 15(a), Federal Rules of Civil Procedure*. In any event, the present state of the Record before us does not establish that Leisure Hills is entitled to Summary Judgment, on the Plaintiff's Title VII claims, by virtue of the newly promulgated affirmative defense.

■ As a preliminary matter, the Plaintiff's evidence does not support a conclusion that she was subjected to a "tangible employment action" such as would preclude the assertion of the affirmative defense. The Supreme Court's holding was clear, that a "tangible employment action" involves "a significant change in employment status." *Burlington Indus., Inc. v. Ellerth*, supra at 2268–69. At most, the Plaintiff has established that, as a result of her rejection of Parson's advances, but more directly attributable to her initiation of the Objectionable Behavior complaint procedure, her shifts were modified so that she would avoid contact with Parson. Accordingly, we find no proper basis upon which the Plaintiff could allege any change in employment status that was equivalent to a demotion, or a reassignment with significantly different job responsibilities. See, *Reinhold v. Virginia*, 151 F.3d 172, 175 (4th Cir.1998).

■ Even if we assumed that Leisure Hills satisfied the first element of the affirmative defense, by promulgating the Objectionable Behavior Policy, by undertaking some screening of Parson's past employment history, and by implementing remedial measures, we would nonetheless conclude, as a matter of law, that the Plaintiff reasonably took advantage of Leisure Hill's corrective procedure, to remedy the circumstance of Parson's harassment. In addressing the Plaintiff's obligation, in that regard, the Supreme Court explained that, "while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden ***." *Burlington Indus., Inc. v. Ellerth*, supra at 2270; but cf., *Meritor Savings Bank, FSB v. Vinson*, supra at 73, 106 S.Ct. 2399 ("we reject petitioner's view that the mere existence of a grievance procedure and a policy against discrimination, coupled with the respondent's failure to invoke that procedure, must insulate the petitioner from liability").

■ Obviously, there is no dispute that the Plaintiff availed herself of the complaint procedure adopted by Leisure Hills. The only issue, on the Record before the Court, is the reasonableness of the Plaintiff's delay in reporting Parson's assaults, and her failure to initiate the procedure immediately after the first assault. Reasonableness, in discharging a duty of care, is a question for the factfinder and, given the totality of the circumstances presented, the Record does not establish that the Plaintiff's two hour delay in reporting Parson's sexually harassing conduct was unreasonable as a matter of law. Cf., *Fall v. Indiana University Bd. of Trustees*, supra at 884 (three month delay in reporting sexual harassment held not unreasonable to sustain new affirmative defense in Summary Judgment). The Plaintiff's failure to report Parson's conduct to anyone until two additional sexual assaults occurred could well be relevant, however, to both the affirmative defense issue, as well as the affirmative defense of damage mitigation, for, "if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided." *Faragher v. City of Boca Raton*, supra at 2292. Nevertheless, we find these issues to entail material issues of fact for the Jury's resolution.

In sum, viewing the evidence in a light most favorable to the Plaintiff, we are satisfied that she has presented sufficient evidence to allow a reasonable Jury to find that

her supervisor created a hostile working environment, for which Leisure Hills is subject to vicarious liability. Although the new affirmative defense, that is available to Leisure Hills, may prove successful, at Trial, in staving a finding of liability on the part of Leisure Hills, or in reducing any damages assessable against Leisure Hills upon a finding of its fault, the presence of genuine issues of material fact precludes the entry of Summary Judgment, in favor of Leisure Hills, on the Plaintiff's hostile environment claim.

 b. *Sexual Harassment under the MHRA.* In reviewing the Record through the aperture of the MHRA, we find that Leisure Hills took timely and appropriate remedial action, which is a complete defense to a finding of liability.[6]

i. *Standard of Review.* In contrast to Title VII, the MHRA expressly prohibits sexual harassment in employment and expressly sets forth a standard for imputing a subordinate's acts of sexual harassment to his employer so as to hold the employer liable. See, *Minnesota Statutes Sections*

*363.01, Subdivision 14; 363.03, Subdivision 1(2)(c).* The MHRA defines sexual harassment to include the following:

> [C]onduct or communication [which] has the purpose or effect of substantially interfering with an individual's employment, public accommodations [etc.]; and in the case of employment, [when] the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action.

*Minnesota Statutes Section 363.01, Subdivision 41.*

 According to Minnesota law, as recently predicted by our Court of Appeals, " '[a]n employer may escape liability for a supervisor's acts of sexual harassment if it takes timely and appropriate remedial action.' "[7] *Todd v. Ortho Biotech, Inc.,* supra at 738, quoting *Fore v. Health Dimensions, Inc.,* 509 N.W.2d 557, 561 (Minn.App.1993); see also, *McNabb v. Cub Foods,* 352 N.W.2d 378, 381–82 (Minn.1984) (applying timely and appropriate remedial action defense to co-worker's harassment).

---

6. In her Memorandum, the Plaintiff claims that Leisure Hills retaliated against her for engaging in the protected activity of reporting Parson's sexual assaults. Nevertheless, that issue is not before us, as the Plaintiff's Complaint does not allege any claim of retaliation. In any event, the Plaintiff's assertions, even if pled, are insufficient to establish a claim of retaliation. To establish a *prima facie* claim of retaliation under the MHRA, the Plaintiff must show: (1) that she engaged in conduct protected by the MHRA; (2) that she was subjected to adverse employment action at the time of, or after, the protected conduct occurred; and (3) that a causal link exists between the protected activity and the adverse employment action. *Adams v. West Pub. Co.,* 812 F.Supp. 925, 933 (D.Minn.1993), aff'd, 25 F.3d 635 (8th Cir.1994).

Our Court of Appeals has aptly described what qualifies as an adverse employment action, as follows:

> Although actions short of termination may constitute an adverse employment action within the meaning of the statute, not everything action that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. Rather, for an action to be considered adverse, it must have had a materially adverse impact on the plaintiff's employment terms or conditions.

*Greaser v. Missouri Dept. of Corrections,* 145 F.3d 979, 984 (8th Cir.1998) [citations and quotations omitted].
The Plaintiff complains that Leisure Hills retaliated against her by sending her back to work immediately after filing the complaint, by inadequately investigating her accusations, by discouraging her from contacting the police, by changing her Unit and work-schedule, and by failing to swiftly, and severely, punish Parson. These alleged "adverse employment actions" are, almost in their entirety, repackaged complaints about the purported inadequacy of Leisure Hills' remedial efforts. In any event, none of these complaints rise above the level of minor and trivial incidents of employment life, especially when measured against the yardstick of the "terms and conditions of employment" and, therefore, they do not constitute retaliatory acts, as a matter of law.

7. While acknowledging that the Minnesota Supreme Court had yet to address this precise issue, our Court of Appeals was persuaded, by the Minnesota Court of Appeals' decision in *Fore v. Health Dimensions, Inc.,* 509 N.W.2d 557, 561 (Minn.App.1993), as well as the plain language of the MHRA, that the Minnesota Supreme Court would construe the statute as the Court of Appeals found to be appropriate. See, *Todd v. Ortho Biotech, Inc.,* 138 F.3d 733, 737 (8th Cir. 1998), pet. for cert. filed, 67 USLW 155, (June 23, 1998) (No. 98–155).

In considering whether the employer, who has actual or constructive knowledge of the harassment, has taken "timely and appropriate remedial action," Minnesota Courts have focused upon three types of remedial approaches: 1) preventative measures, such as the dissemination of a sexual harassment policy, or the establishment of a well-publicized procedure for resolving such complaints; 2) the employer's efforts to alleviate the victim's plight, such as transferring her to another shift or job site; and 3) the investigation of the complaint and discipline of the offender. *Todd v. Ortho Biotech, Inc.*, supra at 738–39, citing *McNabb v. Cub Foods*, supra at 384, *Fore v. Health Dimensions, Inc.*, supra at 561, and *Schlitz v. Holiday Co.*, 1996 WL 653974 *4 (Minn.App.1996).

■ ii. *Legal Analysis.* Leisure Hills contends that it took timely and appropriate action by having in place the Objectionable Behavior Policy and accompanying complaint procedure, by promptly addressing the Plaintiff's plight through a modification of her work schedule, so that she need not work in Parson's presence, and by adequately investigating, suspending, and ultimately terminating Parson. With but little exception, there is no factual dispute about what measures Leisure Hills actually employed in responding to the Plaintiff's report of harassment.

There is no legitimate dispute that Leisure Hills had implemented a sexual harassment policy, and had a well-publicized procedure for correcting sexually harassing behavior. Nor is there any dispute that the Plaintiff, and Parson, were both informed of the policy, and that the Plaintiff was advised in advance, of the procedure for reporting sexual harassment. In the case of harassment by an immediate supervisor, such as Parson, the Objectionable Behavior Policy directed the victim to report her complaint to her Administrator. *Grozdanich Depo.* at 64. In short, Leisure Hills' procedures for the reporting of suspected sexual harassment were legally adequate, and their response to the Plaintiff's complaint was timely and appropriate.

The Plaintiff quarrels with the measures that were taken to separate herself from Parson. It is not disputed that, after the day on which the harassment occurred, the Plaintiff and Parson never worked the in the same Unit, at the same time. The Plaintiff objects to Parson's presence at the routine staff report meetings, and the fact that the two were sometimes both working at the nursing facility, albeit in different Units, but at the same time. The Plaintiff admitted in her deposition, however, that her new supervisor gave her permission to be absent from the weekly report meetings. Further, while the Plaintiff urges that Leisure Hills' efforts at separating the two were inadequate, because of the overlap between her shift, and Parson's, in different Units, the Plaintiff has not shown, nor has she suggested, that a greater degree of workplace separation was feasible, without effecting a tangible job detriment on one of them, or both.

The brunt of the Plaintiff's attack, on Leisure Hills' efforts to address her complaint, is leveled against the measures than Leisure Hills employed to investigate her allegations against Parson. Here, there is a pivotal factual dispute over what potential witnesses were identified by the Plaintiff, and which of those witnesses were actually interviewed by Leisure Hills' investigative team. Leisure Hills asserts that the investigative team "interviewed every other employee that Plaintiff claimed knew anything about the incident," including Harling, Cade, and Tina Carmody ("Carmody"), on "either May 23 or May 24, 1996." *Leisure Hills Mem. Supp. Summ. J.* at 4. There is no dispute that Javorina, Moore, and Skaudis questioned Harling. Cade and Carmody, however, both state that they were never asked about the incident by any Leisure Hills' management employee. *Affidavit of Tina Carmody* ¶ 3, *Miller Aff., Ex.* J; *Affidavit of Jackie Cade* ¶ 3, *Miller Aff., Ex.* K. In addition, Forness, who was present at the nurses' desk, also attests that he was never interviewed by Chris Dworzinski, the Unit Manager, about the incident, and was never questioned by Javorina, Moore, Skaudis, or Strasser. *Affidavit of Steve Forness* ¶ 3, *Miller Aff., Ex.* J.

The investigation team's notes reflect that the Plaintiff had mentioned Carmody, Harling, and Cade, as possible witnesses of the harassment. See, *Skaudis Notes of 5/23/96, Javorina Depo., Ex.* 11, *Miller Aff., Ex.* N.

The notes also reveal that Carmody spoke to the team, since the notes paraphrase Carmody's recollection, that she saw the Plaintiff running from the resident's room—after the first assault on the Plaintiff—and record that the Plaintiff told her that Parson had groped her buttocks. See, *Moore Notes of 5/23/96, Javorina Depo., Ex. 9, Miller Aff., Ex.* N; *Skaudis Notes of 5/23/96.* It is also undisputed that the Plaintiff's husband telephoned Moore at her home, on May 22, 1996, and reported that he had confronted Parson about the assaults, and that Parson had apologized. *Moore Notes of 5/22/26, Javorina Depo., Ex. 6, Miller Aff., Ex.* N. The Plaintiff contends that Leisure Hills had enough evidence about Parson's conduct to permit a swifter, more severe, course of discipline, and that, at the very least, it should have more exhaustively interviewed potential witnesses to the harassment. We cannot agree.

Our Court of Appeals has recognized the necessary limits of swift justice in an employer's administration of timely and appropriate remedial action, in accordance with the MHRA. As explained by the Court:

> Since the demise of the institution of dueling, society has seldom provided instantaneous redress for dishonorable conduct. *** Ordinarily, an organization requires time to respond to embarrassing, emotional and often litigation-spawning claims of sexual harassment. Careers and corporate image rest on the company's balancing of such charges. *** [O]ne cannot reasonably demand the employer to ignore its experience with the alleged offender or to examine a charge of sexual harassment based on one side of the story, in a vacuum.

*Todd v. Ortho Biotech, Inc.,* supra at 739, quoting *Dornhecker v. Malibu Grand Prix Corp.,* 828 F.2d 307, 309–10 (5th Cir.1987). In *Todd,* the plaintiff had accused her supervisor of attempted rape, but there were no witnesses to the incident, and the supervisor vigorously denied the accusation. In the absence of corroboration, the employer's investigation took thirty days, and ultimately resulted in the supervisor's termination, but with a lucrative severance package in exchange for his waiver of any wrongful termi-

nation claims against the company. Our Court of Appeals found the employer's action to be timely and appropriate, as a reasonable means of walking the tightrope between potential liability from two potential sources. *Id.*

Here, in practical effect, Leisure Hills only had the Plain-tiff's version of the events of May 22, 1996, and Parson's vigorous denial. The sole corroboration of the Plaintiff's accusation, that was provided by other witnesses, was tenuous, and indirect. It is undisputed that there were no witnesses to any actual assaults on the Plaintiff, and the Plaintiff's coworkers could only testify that the Plaintiff appeared upset, or that she had repeated her story to them. The strongest corroboration of the Plaintiff's account was her husband's report to Moore, that Parson had apologized about what had happened. The apology, as recalled by the Plaintiff's husband, and reported to Leisure Hills, was not Parson's admission to what the Plaintiff claims occurred, but only indirect evidence of some level of impropriety. Parson's prompt reprimand, through a suspension upon being criminally charged with sexual assault, and his termination upon being convicted of those criminal charges, was timely and appropriate under the circumstances. To hold otherwise, and to accede to the Plaintiff's view, would leave no effective avenue of response by Leisure Hills, which would avoid a high probability of liability for both sexual harassment and wrongful termination.

We cannot agree that Leisure Hills' apparent failure to promptly interview every witness to the occurrences of May 22, 1998, renders its response untimely or inappropriate. Those witnesses who were never questioned by the investigative team, or who were assertedly not questioned enough, observed only the Plaintiff's distressed demeanor, or heard her recounting of Parson's assaults. See, *Forness Aff.* ¶ 2; *Carmody Aff.* ¶ 2; *Cade Aff.* ¶ 2. While a complete and exhaustive interview of each of the Plaintiff's coworkers, who were present on May 22, 1996, would have been preferable, we are here confronting a private entity, which is not vested with expertise in criminal investigations, and we find Leisure Hills' acceptance,

and performance of its investigative responsibilities, to be sufficient, as a matter of law, under the MHRA.

At bottom, the undisputed facts demonstrate that Leisure Hills established a reliable, well-publicized procedure for addressing incidents of sexual harassment, it took the steps that were required to take the Plaintiff out of harm's way, it conducted an adequate investigation, and it appropriately disciplined the alleged harasser. Certainly, Leisure Hills could have done more—indeed, that may always be said in hindsight—but it properly fulfilled its legal obligation to take and appropriate action. Accordingly, the Plaintiff's MHRA sexual harassment claim, is dismissed with prejudice.

### c. *Assault, Battery, and Intentional Infliction of Emotional Distress.*

We assume, as we must for these purposes, that Parson committed the intentional torts of assault, battery, and intentional infliction of emotional distress. Indeed, in seeking Summary Judgment, Leisure Hills does not premise its Motion on the nonexistence of these acts but, rather, on the ground that Parson's three assaults, if they existed, did not occur within the course and scope of his employment, and that, therefore, Leisure Hills is not liable for those acts under the doctrine of *respondeat superior.*

**■■■■ i. *Standard of Review.*** The common law principle of *respondeat superior* holds that an employer is vicariously liable for the wrongful acts of its employees, which are committed in the scope of their employment. *Lange v. National Biscuit Co.,* 297 Minn. 399, 211 N.W.2d 783, 784 (Minn.1973); see also, 1 William Blackstone, *Commentaries on the Laws of England,* p. 429–30 (explaining that the master is responsible for the act of his servant performed "in the usual course of his business"). For an intentional tort to fall within the scope of employment, it need not be shown that the employee's act was motivated by a desire to further the employer's business, but only that " 'the source of the attack is related to the duties of the employee and *** occurs within work related limits of time and place.' " *Marston v. Minneapolis Clinic of Psychiatry and Neu-*

*rology, Ltd.,* 329 N.W.2d 306, 310 (Minn. 1982), quoting *Lange v. National Biscuit Co.,* supra at 786.

**■■■■** Whether the specific conduct "was expressly authorized or forbidden by the principal" is not dispositive, for the test is "whether such conduct should fairly have been foreseen from the nature of the employment and the duties relating to it." *Id.* at 311 n. 3; see also, *Oelschlager v. Magnuson,* 528 N.W.2d 895, 902 (Minn.App.1995), rev. denied (Apr. 27, 1995). The foreseeability, and the relation to the scope of employment, of an employee's intentional tort is a question of fact, ordinarily suited to resolution by a Jury. See, *Marston v. Minneapolis Clinic of Psychiatry, Ltd.,* supra at 311; *Oelschlager v. Magnuson,* supra at 903.

**■■■ ii. *Legal Analysis.*** The Minnesota Courts have frequently addressed the relation of an employee's sexual assault to the scope of his employment, and have reached divergent results. See, e.g., *P.L. v. Aubert,* 545 N.W.2d 666, 667–68 (Minn.1996) (sexual assault by teacher upon student nor within scope of employment); *Marston v. Minneapolis Clinic of Psychiatry, Ltd.,* supra at 309–11 psychologist's sexual assault of patient within scope of employment); *Oelschlager v. Magnuson,* supra at 902–03 pastor's sexual battery upon church member properly found by Jury to be within scope of his employment); *L.J. v. Peng,* 1997 WL 228960 *1–2 (Minn.App., May 6, 1997) (sexual assault by acupuncturist against patient outside scope). A brief survey of other jurisdictions demonstrates that there is no consensus on the application of *respondeat superior* to a sexual assault by an employee. See, e.g., *Primeaux v. United States,* 102 F.3d 1458, 1463 (8th Cir.1996) (officer aided by agency relationship with government in committing sexual assault acted within scope of employment, according to South Dakota law); *Benavidez v. United States,* 998 F.Supp. 1225, 1228 (D.N.M.1997) (holding that, under New Mexico law, psychologist who used therapy sessions to facilitate sexual assault acted within scope of employment); *Niece v. Elmview Group Home,* 131 Wash.2d 39, 929 P.2d 420, 429 (Wash.1997) (Washington law does

not permit vicarious liability on a nursing home for sexual assault of patient by staff member); *Doe v. Purity Supreme, Inc.,* 422 Mass. 563, 664 N.E.2d 815, 820 (Mass.1996) (because "rape and sexual assault of an employee do not serve the interests of the employer," those acts are not within scope of employment, according to Massachusetts law). In *Marston,* the Minnesota Supreme Court rejected any categorical approach to this issue, and reasoned that, because foreseeability and the relation of sexual assault to the scope of employment, were questions of fact, the issue should be addressed on a case-by-case basis. *Marston v. Minneapolis Clinic of Psychiatry, Ltd.,* supra at 311, citing *Lyon v. Carey,* 533 F.2d 649 (D.C.Cir. 1976).

We recognize the paradox presented by a foreseeability standard for *respondeat superior* liability, especially in cases, such as this one, where the tort involves a sexual assault. Naturally, the more outrageous the employee's tortious act should be, the less likely it could be described as foreseeable, and the less likely that the employer could be required to assume responsibility for the act, as a general risk of the employer's business. In fact, this paradox has prompted one commentator to remark: "It is a curious state of affairs, in which the less badly treated a complainant has been, the better are his prospects of getting damages!" T. Baty, *Vicarious Liability,* p. 193 (1916). The Minnesota Courts have resolved this anomaly by eschewing categorical approaches to an assessment of the scope of employment, and by directing Courts to engage in a particularized, factual inquiry.

In *Marston,* the employee was a psychologist who made unwelcome sexual advances upon his patients during and after therapy sessions in his office. *Id.* at 308. Expert testimony in the lower Court had, in fact, suggested that improper sexual relations, between a doctor and his patients, was a "well-known hazard and thus \*\*\* foreseeable and a risk of employment." *Id.* at 311. In contrast, the Supreme Court, in *Aubert,* was urged to apply *Marston* so as to hold a school district liable for battery and intentional infliction of emotional distress which

was committed by a schoolteacher on her student, under a theory of *respondeat superior.* The Court applied the test set forth in *Marston,* but found that, although the torts occurred within the work-related limits of time and place, the plaintiff had not established foreseeability. The Court explained:

> Here we find no evidence that such relationships between teacher and student are a "well-known hazard"; thus foreseeability is absent. While it is true that teachers have power and authority over students, no expert testimony or affidavits were presented regarding the potential for abuse of such power in these situations; thus there can be no implied foreseeability.

*P.L. v. Aubert,* supra at 668. Because the school district had no actual notice of the teacher's potential for this type of misconduct, and since no evidence was offered to suggest that such misconduct was a foreseeable hazard in student-teacher relations, the Court held that the torts fell outside of the teacher's scope of employment, and concluded that the school district was not vicariously liable. *Id.*

A comparison of *Marston* with *Aubert* reveals that, in the absence of evidence—such as the opinion of a qualified expert—that a sexual assault of the plaintiff, by the employee, was sufficiently likely so as to put the employer on notice, Minnesota Courts will not presume to impute liability for such conduct upon an employer, as a foreseeable risk of employment. See also, *Oslin v. State,* 543 N.W.2d 408, 413 (Minn.App.1996) (holding that sexual harassment of employee by supervisor was foreseeable where other employees had complained about supervisor's harassing behavior); *L.J. v. Peng,* supra at \*2 (the employer is not vicariously liable because "there is no evidence that sexual contact between an acupuncturist and a patient is a foreseeable risk of the acupuncturist's employment").

Here, the Plaintiff has presented no evidence that would suggest, let alone prove, that Parson's alleged sexual assault of her was foreseeable. Although his acts of sexual harassment were facilitated by his supervisory authority over the Plaintiff, the Record reveals nothing that would conceptually dis-

tinguish this case from *P.L. v. Aubert,* supra. In *Aubert,* the tortfeasor's action was facilitated by the authority he exercised over the plaintiff as a result of their personal relationship. Yet, with absolutely no evidence that Parson's presumed acts of sexual assault were a part of the foreseeable risk of Leisure Hills' provision of nursing care, like the plaintiff in P.L., the Plaintiff has failed to show that there is a genuine issue for Trial on her claim that Leisure Hills is vicariously liable for his assault, battery, and intentional infliction of emotional distress. Accordingly, the Plaintiff's claims against Leisure Hills, in Counts III, IV, and VI are dismissed.

d. *Negligent Hiring/Retention/Supervision.* The Plaintiff, in Count V, claims that Leisure Hills negligently hired, and continued to employ Parson, whose dangerous propensities posed an unreasonable risk to its employees. She also asserts that Leisure Hills failed to uphold its duty of care to supervise Parson in a manner that would avoid imposing an unreasonable risk of harm upon its employees. The breach of these duties, the Plaintiff claims, proximately caused her injury.

■■■■■ i. *Standard of Review.* Minnesota recognizes three distinct causes of action where a plaintiff sues an employer in negligence, for injuries caused by the conduct of one of its employees: negligent hiring, negligent retention, and negligent supervision. See generally, *Cook v. Greyhound Lines, Inc.,* 847 F.Supp. 725, 732 (D.Minn.1994) (comparing negligent employment doctrines). Negligent employment, in general, imposes direct liability on the employer only where the plaintiff's injuries are the result of the employer's failure to take reasonable precautions to protect her from the misconduct of its employees. See, *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907, 911 n. 5 (Minn. 1983).

Negligent hiring, has been described by the Minnesota Supreme Court as:

the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of employment, it should

have been foreseeable that the hired individual posed a threat of injury to others. *Id.* at 911.

■■■ As a precondition to liability "under the theory of negligent hiring[,] an employer must breach its 'duty to exercise reasonable care in view of all the circumstances in hiring individuals who, because of the employment, may pose a threat of injury to members of the public.'" *Smith v. DataCard Corp.,* 9 F.Supp.2d 1067, 1082 (D.Minn.1998), quoting *Ponticas v. K.M.S. Investments,* supra at 911. The Court explained that the degree of care required, in hiring a new employee, is largely dependent upon the nature of the position:

The scope of the investigation is directly related to the severity of the risk third parties are subjected to by an incompetent employee. *** [O]nly slight care might suffice in the hiring of a yardman, a worker on a production line, or other types of employment where the employee would not constitute a high risk of injury to third persons ***.

*Ponticas v. K.M.S. Investments,* supra at 913.

■■■ A negligent retention claim might arise, however, "when an employer becomes aware or should have become aware that an employee poses a threat and fails to take remedial measures to ensure the safety of others." *Benson v. Northwest Airlines, Inc.,* 561 N.W.2d 530, 540 (Minn.App.1997), rev. denied (Minn., June 11, 1997), citing *Yunker v. Honeywell, Inc.,* 496 N.W.2d 419, 423 (Minn.App.1993), rev. denied (Minn., April 20, 1993). Under Minnesota law, a viable claim of negligent retention requires the existence of at least a threat of, or reasonable apprehension of, physical injury. *Thompson v. Olsten Kimberly Qualitycare, Inc.,* 980 F.Supp. 1035, 1041 (D.Minn.1997), citing *Bruchas v. Preventive Care, Inc.,* 553 N.W.2d 440, 442–43 (Minn.App.1996). Employment based sexual harassment involves enough of a threat of a physical injury to permit a negligent retention claim. *Smith v. DataCard Corp.,* supra at 1083; *D.W. v. Radisson Plaza Hotel Rochester,* 958 F.Supp. 1368, 1378 (D.Minn.1997); *Mandy v. Minnesota*

*Mining & Mfg.,* 940 F.Supp. 1463, 1470–72 (D.Minn.1996); *Thompson v. Campbell,* 845 F.Supp. 665, 676 (D.Minn.1994). While the issue remains in dispute, there is a consensus that the negligent retention doctrine imposes liability for an employee's torts which " 'almost invariably' occur outside the scope of employment." *Bruchas v. Preventive Care, Inc.,* supra at 442; *D.W. v. Radisson Plaza Hotel Rochester,* supra at 1378. In *Cook v. Greyhound Lines, Inc.,* supra at 807, we concluded that the doctrine could only logically apply when the employee acted outside of the course of his, or her, employment, or else it would merely reiterate the precepts of *respondeat superior,* a less than useful development in the law. See, *Thompson v. Olsten Kimberly Quality-care, Inc.,* supra at 1041 n. 4.

Finally, the doctrine of negligent supervision imposes a duty on employers to exercise ordinary care in supervising the employment relationship, so as to prevent the foreseeable misconduct of an employee from causing harm to others. *Cook v. Greyhound Lines, Inc.,* supra at 732. In contrast to the doctrine of negligent retention, negligent supervision evolved from the *respondeat superior,* doctrine, see, *Ponticas v. K.M.S. Investments,* supra at 910, and liability can only be based upon a tort that was committed within the employee's scope of employment. *Bruchas v. Preventive Care, Inc.,* supra at 443; *Oslin v. State,* supra at 414; *Rosenbloom v. Senior Resource, Inc.,* 974 F.Supp. 738, 745 (D.Minn.1997).

ii. *Legal Analysis.* Before examining the merits of the Plaintiff's negligent employment claims, we must address the threshold issue that is presented by Leisure Hills' suggestion that these claims are preempted by the MHRA, which contains an exclusivity provision. See, *Minnesota Statutes Section 363.11.* The Minnesota Supreme Court has held that a plaintiff may simultaneously maintain claims under the MHRA, as well as for common law negligence when the claims arise from the same underlying facts, and seek the same damages. See, *Vaughn v. Northwest Airlines, Inc.,* 558 N.W.2d 736, 744–45 (Minn.1997). The Court explained that, if the common law claims are founded

upon a duty of care that is different than supplied by the MHRA, then both theories of recovery may be simultaneously pursued. *Id.* In *Moss v. Advance Circuits, Inc.,* 981 F.Supp. 1239, 1252 (D.Minn.1997), a Court in this District distinguished *Vaughn,* and held that an employee's negligent retention and supervision claims were preempted by her paralleling MHRA sexual harassment claim, when the former claims were based, in their entirety, upon the employer's actions after being made aware of the harassment.

This distinction is instructive in our consideration of this aspect of the Plaintiff's claims. Here, the duty imposed by the doctrines of negligent retention, and supervision, have merged with those imposed by the MHRA, when, on May 22, 1996, the Plaintiff informed her Leisure Hills that Parson had sexually assaulted her. At that moment, Leisure Hills became aware that Parson posed a potential threat to the safety of others, see, *Benson v. Northwest Airlines, Inc.,* supra at 540, and was placed on notice of Parson's sexual harassment, see, *Minnesota Statutes Section 363.01, Subdivision 41.* From that point forward, Leisure Hills' statutory duty—to take "timely and appropriate remedial action," *Todd v. Ortho Biotech, Inc.,* supra at 738—necessarily subsumed any corresponding common law duty to take remedial measures, so as to ensure the safety of others, as required by the negligent retention doctrine, and to use ordinary care in supervising its workplace, as required by the negligent supervision doctrine. Thus, to the extent that the Plaintiff's negligent employment claims request damages, for these asserted breaches of Leisure Hill's duty of care to the Plaintiff, which occurred on or after May 22, 1996, they are preempted by the MHRA.

We have also considered the possibility that the MHRA preempts the Plaintiff's negligent employment claims that are predicated on Leisure Hill's negligence, if any, at any time before the Plaintiff was assaulted. Conceptually, there is some overlap between Leisure Hills' common law duty to use reasonable care in ensuring the safety of the workplace, and its statutory duty, as imposed by the MHRA, which includes an obligation

to take preventative measures so as to preclude harassment in the workplace. However, given the fairly nebulous quality of Leisure Hills' common law and statutory duties, and what we have noted elsewhere to be the unsettled state of Minnesota's law in this area, we believe that the wiser course would be to permit this aspect of the Plaintiff's negligent employment claims to pass, at this time, the preemption hurdle. See, *Thompson v. Olsten Kimberly Qualitycare, Inc.,* supra at 1040, citing *Mandy v. Minnesota Mining & Mfg.,* supra at 1472.

The Plaintiff's negligent supervision claim cannot, however, clear the preclusive bar that is applied to employee torts which were committed outside of the scope of employment. See, *Bruchas v. Preventive Care, Inc.,* supra at 443; *Oslin v. State,* supra at 414; *Rosenbloom v. Senior Resource, Inc.,* supra at 745. The discussion of the doctrine of *respondeat superior,* in the context of the Plaintiff's assault, battery, and intentional infliction of emotional distress claims, has plainly established that, since Parson's acts were not foreseeable, as the term has been interpreted by the Minnesota Courts, they did not fall within the scope of his employment.

 Therefore, we turn to what remains of the Plaintiff's negligent employment claims; namely, 1) that Leisure Hills violated its duty of care by hiring Parson, whose dangerous propensities posed an unreasonable risk of harm to others; and 2) that Leisure Hills, from the time Parson was hired until May 22, 1996, breached a duty of care by continuing to employ an individual who they knew, or should have known, posed a risk of harm to others. As the linchpin to these claims is the circumstances under which Leisure Hills hired Parson, we address the negligent hiring claim first.

The critical issue confronting the Plaintiff's negligent hiring claim is whether Parson's propensities "should have been discovered by reasonable investigation," *Ponticas v. K.M.S. Investments,* supra at 911 n. 5, before Leisure Hills hired him. It is undisputed that, before hiring Parson, Leisure Hills learned that he had a valid nursing license, had no criminal record, and had worked for several nursing facilities. The facts in the Record

evince that Leisure Hills' only opportunity to learn of Parson's potentially harmful propensities was during the series of communications between Skaudis and Jamar, in which Jamar praised Parson's abilities as a nurse. Although Jamar indicated that Parson had "trouble dealing with some employee issues," Skaudis did not inquire further, nor did she ask for elaboration.

In *M.L. v. Magnuson,* 531 N.W.2d 849, 857 (Minn.App.1995), rev. denied (Minn., July 20, 1995), the Minnesota Court of Appeals addressed a closely paralleling set of circumstances. There, individuals, who claimed to have been sexually abused by their pastor, brought a negligent hiring action against the church. There was no evidence that the church had actual knowledge of the pastor's propensities, but the regional church body knew that the pastor had sexually abused a boy some two years earlier. The Court held that the evidence still did not support a Jury finding that the church should have learned of the pastor's propensities after a reasonable investigation. As it was "undisputed that the regional church did not tell [the hiring church] about this incident and took no action against [the pastor] that might have been discovered" by the church, the Minnesota Court of Appeals held that the facts did "not permit an inference that [the hiring church] could have learned about [the pastor's] propensities from the regional church, which was unwilling to disclose this information voluntarily." *M.L. v. Magnuson,* supra at 857.

Were the facts before us to demonstrate, as was the case in *Magnuson,* that Jamar made no reference to Parson's employment difficulties, and had made no effort to alert Skaudis to at least some irregularity in his actions as an employee, we would find the reasoning in *Magnuson* persuasive. Of course, we recognize that the existence of the confidentiality agreement between Parson, his union, and UMC–M, and the fact that Parson had no record of discipline at UMC–M, could well have impaired Leisure Hills's capacity to conduct a "reasonable investigation" into Parson's past employment history, but the fact of the matter is that Jamar informed Skaudis, that Parson had some dif-

ficulties in dealing with some employee issues. While not a "red flag," we conclude that this comment was sufficient to render the adequacy of Leisure Hills' investigation a Jury issue.

The Plaintiff's negligent retention theory is governed by the same reasoning. Had Skaudis made further inquiry, there is a plausible inference that Jamar would have been forthcoming, and would have disclosed the prior instances of Parson's sexual misconduct. While there is no competent evidence that Leisure Hills learned of Parson's history of sexual misconduct until May 22, 1996—when the Plaintiff reported the assaults upon her to management—it is for a Jury to determine whether that information would, in all probability, have been forthcoming had additional questions, on that topic, been posed by Skaudis.[8] Therefore, Count V of the Complaint, to the extent that it alleges that Leisure Hills' negligently hired Parson, and negligently retained him up to the date of the Plaintiff's report of the sexual assaults, withstands Summary Judgment by virtue of a material issue of genuine fact.

■ e. *Negligent Infliction of Emotional Distress.* In Count VII, the Plaintiff presents a sparsely worded claim for negligent infliction of emotional distress against Parson and Leisure Hills. The Complaint does not disclose, even suggestively, whether Leisure Hills' purported liability is vicarious—based upon Parson's negligent infliction of emotional distress—or is direct, based upon its own asserted negligence. In either case, however, the claim must fail as a matter of law.

■ First, there can be no question but that Parson's reputed sexual assaults on the Plaintiff were not committed within the scope of his employment, as defined by Minnesota law in the context of vicarious liability for employee negligence. Where employee negligence, as opposed to an intentional tort, is at issue, the tortious conduct does not fall within the scope of employment unless the employee's " 'conduct was, to some degree, in furtherance of the interests of his employer.' " *Marston v. Minneapolis Clinic of Psychiatry and Neurology, Ltd.,* supra at 309, quoting *Edgewater Motels, Inc. v. Gatzke,* supra at 17 n. 6. In addition, a Court should also consider "whether the conduct is of the kind that the employee is authorized to perform and whether the act occurs substantially within authorized time and space restrictions." *Edgewater Motels, Inc. v. Gatzke,* 277 N.W.2d 11, 15 (Minn.1979), citing *Boland v. Morrill,* 270 Minn. 86, 132 N.W.2d 711 (1965). If the Plaintiff wishes to characterize Parson's actions on May 22, 1996, as negligent, then, unquestionably, his acts of sexual assault were not in furtherance of Leisure Hills' business, much less were they authorized.

If, on the other hand, this claim is premised upon Leisure Hills' negligence in failing to prevent the assaults that resulted in the Plaintiff's emotional distress, she has not identified any breach of a duty, by Leisure Hills, other than those identified in her negligent employment claims. The remnants of those claims of negligence, which were not preempted by the MHRA, or otherwise delimited by the doctrine of *respondeat superior,* remain triable for reasons previously articulated and, to that extent, the Plaintiff's negligent infliction of emotional distress claim remains viable.

In total, Count I of the Complaint, which alleges a violation of Title VII, survives Leisure Hills' Motion for Summary Judgment, as does the portions of Count V which assert direct liability against Leisure Hills for negligent hiring, and negligence in retaining Par-

8. In her deposition, the Plaintiff testified that an unidentified nurse, who Leisure Hills had hired after Parson's date of hire, and who had worked with him at UMC–M, informed the Plaintiff that Parson had engaged in inappropriate sexual behavior with co-workers while at UMC–M. *Grozdanich Depo.* at 219–22. The Plaintiff also testified that another co-worker had overheard Leisure Hills' management personnel discuss Parson's then-rumored misconduct with UMC–M senior staff. *Grozdanich*

*Depo.* at 260. Both of these out-of-Court statements are hearsay because, although made by the servants of a party-opponent, they do not concern a matter within the scope of the nurses' employment and, therefore, they cannot be used in opposition to a Summary Judgment Motion. See, *Rule 56(e), Federal Rules of Civil Procedure; Rules 801 and 802, Federal Rules of Evidence; Johnson v. Baptist Medical Center,* 97 F.3d 1070, 1073 (8th Cir.1996).

son up to the time of the Plaintiff's report of his three acts of sexual assault.

2. *The Plaintiff's Claims against UMC–M.* In her three claims against UMC–M, the Plaintiff cites three acts of the hospital's alleged negligence, as having proximately caused Parson's sexual assault, and her resultant injury. The first occurred in 1992, when UMC–M was notified that Parson had sexually abused one of the vulnerable adults, but failed to report the incident to the authorities, as is required by Statute. See, *Minnesota Statutes Section 626.557.* In Count VII, the Plaintiff claims that this failure to uphold a statutory duty was negligence *per se,* which proximately caused Parson's assault of the Plaintiff four years later. The second, and third, acts of UMC–M's claimed negligence related to its issuance of a letter of recommendation, which noted that Parson had never been disciplined, and to the hospital's failure to inform Leisure Hills of Parson's prior misconduct or character. In Counts IX and X, the Plaintiff advances causes of action for negligent misrepresentation, and for a negligent failure to warn. UMC–M moves for Judgment on the Pleadings, or for Summary Judgment, on each of these Counts.

■■■ a. *Negligence Per Se.* On March 18, 1992, Parson sexually assaulted T.M., a patient at the UMC–M facility. It is undisputed, for these purposes, that UMC–M was required to report that abuse to the police, or to an appropriate State agency under the Vulnerable Adults Act ("VAA"). See, *Minnesota Statutes Section 626.557.* Nor is it contested that UMC–M failed to make such a report. In 1992, when the incident occurred, the VAA provided that "[a] person required by this section to report who negligently or intentionally fails to report is liable for damages caused by the failure." *Minnesota Statutes Section 626.557, Subdivision 7(b) (1992).*[9] By UMC–M's Motion, the Court is presented with a question of first impression under Minnesota law; namely,

whether the VAA extends an express, or an implied right of action, to persons who are not vulnerable adults in order that such persons may seek damages arising from the failure to report the abuse of a vulnerable adult. We hold that it does not.

■■■ i. *Standard of Review.* It is a well-settled principle of judicial restraint, which is heeded by the Minnesota Courts, that the violation of a statute does not give rise to a civil cause of action that does not exist at common law, unless the statute expressly so provides, or does so by clear implication. See, *Bruegger v. Faribault Co. Sheriff's Dep't,* 497 N.W.2d 260, 262 (Minn.1993); *Larson v. Dunn,* 460 N.W.2d 39, 47 n. 4 (Minn.1990); *County of Morrison v. Litke,* 558 N.W.2d 16, 18 (Minn.App.1997); *Flour Exchange Bldg. Corp. v. State,* 524 N.W.2d 496, 498 (Minn.App.1994), rev. denied (Feb. 14, 1995). Where the statutory language is not express, Minnesota Courts have applied the approach prescribed by the United States Supreme Court, in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and have examined several factors to determine whether a statutory cause of action is implied. These factors include: 1) whether the plaintiff belongs to the class for whose special benefit the statute was enacted; 2) whether the legislature revealed its intent to create or deny a remedy; and 3) whether implying a remedy would be consistent with the underlying purpose of the legislative scheme. See, *Flour Exchange Bldg. Corp. v. State,* supra at 499; *Counties of Blue Earth v. Minnesota Dep't of Labor and Indus.,* 489 N.W.2d 265, 268 (Minn.App. 1992); *Hommerding v. Travelers Insurance Co.,* 1995 WL 6438 *1 (Minn.App.1995), rev. denied (Mar. 14, 1995); but cf., *Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (focal point of inquiry is congressional intent).

■■■ If, however, an underlying common law cause of action exists, then the Statute can establish a standard of care.

9. The provision has since been amended to read as follows:

> A mandated reporter who negligently or intentionally fails to report is liable for damages caused by the failure. Nothing in this subdivision imposes vicarious liability for the acts or omissions of others.
>
> *Minnesota Statutes Section 526.557, Subdivision 7.*

*Bruegger v. Faribault Co. Sheriff's Dep't,* supra at 262; *Lorshbough v. Township of Buzzle,* 258 N.W.2d 96, 102 (Minn.1977). In a common law negligence claim, a breach of a Statute will constitute negligence *per se,* if the persons harmed as a result of the breach are within the intended protection of the regulatory measure, and if the harm suffered is of a type the regulation was intended to prevent. *Bills v. Willow Run I Apartments,* 547 N.W.2d 693, 694 (Minn.1996); *Alderman's, Inc. v. Shanks,* 536 N.W.2d 4, 8 (Minn.1995); *Pacific Indem. Co. v. Thompson–Yaeger, Inc.,* 260 N.W.2d 548, 558–59 (Minn.1977).

ii. *Legal Analysis.* Without a doubt, the VAA expressly provides for a private cause of action to remedy damages caused by a failure to report the abuse of a vulnerable adult. See, *Minnesota Statutes Section 626.557, Subdivision 7.* The only Minnesota decision, which has addressed the VAA's provision of a private right of action, considered whether that right of action extended to persons aggrieved by negligent investigation, and intervention, after a report had been made. See, *Hoppe v. Kandiyohi Co.,* 543 N.W.2d 635 (Minn.1996). The Court observed that the legislature had expressly imposed civil liability for a failure to report, but declined to extend the right of action beyond what the legislature had prescribed. *Id.* at 638. As a result, *Hoppe* reflects the Minnesota Courts' reluctance to contrive causes of action where the legislature has refused to tread, but the case does not dispositively demark the precise breadth of the VAA's liability provision.

■ That question, we think, is best resolved, with the *Cort v. Ash* factors in mind, as an issue of statutory interpretation. In interpreting a statute, the Court's primary function is to ascertain and effectuate the intent of the legislature. *Minnesota Statutes Section 645.16.* If the statute is unambiguous, then its plain language should be enforced. *Id.; Kirkwold Const. Co. v. M.G.A. Const., Inc.,* 513 N.W.2d 241, 244 (Minn. 1994). Where, however, the literal meaning of the words of a statute would produce an absurd result, Courts are obliged to look beyond the statutory language to other indicia of legislative intent. *Olson v. Ford Motor Co.,* 558 N.W.2d 491, 494 (Minn.1997).

■ Although remedial legislation, such as the VAA, should be liberally construed, so as to effectuate its purpose, see, *Current Technology Concepts, Inc. v. Irie Enterprises, Inc.,* 530 N.W.2d 539, 544 (Minn.1995), a modification of the common law should be "limited in its application and by its necessary implication to the removal of the mischief against which the statute is directed." *In re Karger's Estate,* 253 Minn. 542, 93 N.W.2d 137, 143 (Minn.1958); see also, *Hunt v. Burns,* 90 Minn. 172, 95 N.W. 1110, 1112 (Minn.1903) ("statutes creating liabilities are to be strictly construed"). In the final analysis, "the remedial nature of a statute does not justify a construction which gives the statutory language an application and meaning not intended by the legislature." *Pella Products, Inc. v. Arvig Telephone Co.,* 488 N.W.2d 316, 317 (Minn.App.1992), rev. denied (Sept. 30, 1992), citing *Kalin v. Oliver Iron Min. Co.,* 228 Minn. 328, 37 N.W.2d 365, 368 (Minn.1949).

By its express terms, the VAA allows actions for damages caused by the failure to report the abuse of a vulnerable adult. The Statute does not limit, in any way, the type of injury for which damages are available, nor the class of persons who are entitled to pursue civil claims. The Plaintiff urges that we adhere to the plain terms of Subdivision 7, and allow her a statutory right to proceed against UMC–M, even though she is not a vulnerable adult. The Plaintiff's theory maintains that Leisure Hills would not have hired Parson but for UMC–M's failure to report the sexual abuse of T.M. to the police or to a social service agency. It would logically follow, under the Plaintiff's interpretation of the VAA, that any subsequent tort committed by Parson at Leisure Hills—such as defaming a patient, or negligently waxing the floor so as to cause a fellow nurse to slip and fall—would be redressable under the VAA. We believe that such an interpretation of the VAA would produce an absurd result, by transforming hospitals, and other facilities, who fail to report vulnerable adult abuse, into general insurers for all of the

future tortious misconduct by the alleged perpetrator.

We find that the legislature's intent, as embodied in the VAA as a whole, properly informs us on the legitimate construction of its civil liability provision. See, *Olson v. Ford Motor Co.*, supra at 494; *Cort v. Ash*, supra at 78, 95 S.Ct. 2080. The legislature has expressed its overall purpose, in enacting the VAA, as follows:

> The legislature declares that the public policy of this state is to protect adults who, because of physical or mental disability or dependency on institutional services, are particularly vulnerable to abuse or neglect; to provide safe institutional or residential services or living environments for vulnerable adults who have been abused or neglected; and to assist persons charged with the care of vulnerable adults to provide safe environments.

*Minnesota Statutes Section 626.557, Subdivision 1.*

In a nutshell, the Statute was enacted " 'for the protection of a limited class of persons from their inability to protect themselves.' " *Thelen v. St. Cloud Hospital*, 379 N.W.2d 189, 190 (Minn.App.1985), quoting *Seim v. Garavalia*, 306 N.W.2d 806, 811 (Minn.1981).

Allowing an individual, such as the Plaintiff, who is not a vulnerable adult, to employ the VAA as a source of civil liability, does not further the "removal of the mischief against which the statute is directed." *In re Karger's Estate*, supra at 143. If anything, such a construction would undermine the VAA's remedial purpose by diluting its civil enforcement mechanism beyond the protection of that class of citizens, who are unable to protect themselves, and who, therefore, most need the protection.

The Plaintiff contends that permitting her to vindicate the rights of vulnerable adults would further the purposes of the Act, and would be consistent with Legislature's intent, because the intended beneficiaries of the VAA are often unable to prosecute such actions themselves. We can accept the premise, that a failure to report abuse could lead to a further mistreatment of vulnerable adults, which could go unremedied, and that increasing the liability potential of those failing to report, could serve as an added incentive to prompt reporting. However, opening the VAA so broadly, so as to permit causes of action as far afield as the Plaintiff's, would be a simple act of legislating, a governmental function we do not serve. If, as the Plaintiff contends, the Minnesota Legislature intended to multiply the causes of action, which could be maintained against those caring for vulnerable adults, so as to render their potential for liability near absolute, we are confident that the Legislature would have so provided.

For the same reason, the Plaintiff cannot maintain a common law claim in negligence against UMC–M, based upon their violation of the VAA. The Plaintiff is simply not a member of the class of persons who were intended to be protected by the Act. See, *Bills v. Willow Run I Apartments*, supra at 694. The Plaintiff's cause against UMC–M, based upon its failure to report Parson's abuse of T.M., fails to state a claim upon which relief can be granted and, therefore, is dismissed with prejudice.

b. *Negligent Misrepresentation.* The Plaintiff's negligent misrepresentation theory contends that, when UMC–M's representative, Jamar, told Leisure Hills that Parson was a "very good clinical nurse," with "good assessment skills," and held "a good relationship with patients," it breached its duty of care by negligently conveying false information, which Leisure Hills relied upon, and which proximately caused the Plaintiff's injury. UMC–M responds by arguing that the claim should be dismissed for three reasons: 1) Minnesota does not recognize claims for negligent misrepresentation that result in a risk of physical harm; 2) the Plaintiff's case does not meet the elements of negligent misrepresentation; and 3) Minnesota's public policy, in favor of settlement, precludes its liability for adhering to the confidentiality agreement which memorialized the amicable resolve of Parson's claims against it.

The tort of negligent misrepresentation involving a risk of physical harm has been defined, by the Restatement (Second) of Torts § 311 (1965), as follows:

(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results

(a) to the other, or

(b) to such third persons as the actor should expect to be put in peril by the action taken.

(2) Such negligence may consist of failure to exercise reasonable care

(a) in ascertaining the accuracy of the information, or

(b) the manner in which it is communicated.

The Minnesota Supreme Court has stated, without recognizing the cause of action, that the elements of this tort are: "(1) a duty of reasonable care in conveying information; (2) a breach of that duty by negligently giving false information; (3) reasonable reliance on the misrepresentations, which reliance is the proximate cause of physical injury; and (4) damages." *Smith v. Brutger Cos.,* 569 N.W.2d 408, 413 (Minn.1997).

At the outset, it must be emphasized that "it is axiomatic that federal courts apply state substantive law in diversity suits." *JN Exploration & Production v. Western Gas Resources, Inc.,* 153 F.3d 906, 909 (8th Cir. 1998), citing *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In the absence of controlling State law, a Federal Court, which exercises supplemental jurisdiction over a dispute, as we do here, must predict how the State's highest Court would decide the issue. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); see also, *First Colony Life Ins. Co. v. Berube,* 130 F.3d 827, 829 (8th Cir.1997) (diversity jurisdiction).

▮ The Court is aware of no Minnesota authority which recognizes the tort of negligent misrepresentation involving a risk of physical harm. The claim, as phrased in the Second Restatement, has been recognized by several other jurisdictions. See, e.g., *D.S.A., Inc. v. Hillsboro Ind. Sch. Dist.,* 973 S.W.2d 662, 664 (Tex.1998); *Brogan v. Mitchell Int'l, Inc.,* 181 Ill.2d 178, 229 Ill.Dec. 503, 692 N.E.2d 276, 278 (Ill.1998); *Bailey v. Huggins Diagnostic & Rehab. Center, Inc.,* 952 P.2d 768, 772 (Colo.App.1997), cert. denied (Colo., Feb. 23, 1998). Indeed, some Courts have applied this theory to situations, which are analogous to the case at bar, and which involve a negligent representation, that is made to a prospective employer about an individual who has applied to that employer for a job. See, *Randi W. v. Muroc Joint Unified Sch. Dist.,* 14 Cal.4th 1066, 60 Cal. Rptr.2d 263, 929 P.2d 582, 591 (Cal.1997) ("the writer of a letter of recommendation owes to third persons a duty not to misrepresent the facts in describing the qualifications and character of a former employee, if making these misrepresentations would present a substantial, foreseeable risk of physical injury to the third per-sons."); *Golden Spread Council, Inc. # 562 v. Akins,* 926 S.W.2d 287, 292–93 (Tex.1996) (boy scout council has duty not to recommend scoutmaster to church if council knew or should have known that scoutmaster was likely to molest boys); *Gutzan v. Altair Airlines, Inc.,* 766 F.2d 135, 141 (3rd Cir.1985) (employment agency, who referred convicted rapist to prospective employer, liable for rape of plaintiff co-employee); but cf., *Moore v. St. Joseph Nursing Home, Inc.,* 184 Mich.App. 766, 459 N.W.2d 100, 102–03 (Mich.App.1990) (former employer had no duty to disclose former employee's dangerous proclivities to inquiring prospective employer, and was not liable to estate of murdered co-worker, absent foreseeability of event or victim); *Neptuno Treuhand–Und Verwaltungsgesellschaft Mbh v. Arbor,* 295 Ill.App.3d 567, 229 Ill.Dec. 823, 692 N.E.2d 812 (Ill.App.1998) (declining to recognize "negligent referral" cause of action, in action claiming economic loss from Chicago Board of Trade's failure to mention, in a reference letter, that futures trader had been subject to discipline), appeal denied, 178 Ill.2d 582, 232 Ill.Dec. 848, 699 N.E.2d 1033 (1998).

The Minnesota Supreme Court has recently stated that, in this jurisdiction, the cognizability of the tort of negligent misrepresentation involving the risk of physical harm is a decidedly open question. In *Smith v. Brutger Cos.,* supra, a tenant, who had been sexually assaulted by an intruder, attempted to make such a claim against her landlord who,

allegedly, had negligently misrepresented facts about the security of the complex. The Supreme Court described the theory, as outlined in the Second Restatement, but passed upon the opportunity to determine whether Minnesota would recognize the cause of action. As the majority explained:

> While we do not foreclose the possibility of recognizing in Minnesota the tort of negligent misrepresentation involving the risk of physical harm, we decline to do so today. This case is not the appropriate vehicle to do so. Even if we were to recognize the tort of negligent misrepresentation *** [t]he undisputed material facts of this case do not give rise to an actionable claim for negligent misrepresentation because the Smiths did not reasonably rely upon [the landlord's] statements.

*Id.*

Three Justices dissented from the decision, two of whom urged that "it would be good public policy to extend the tort of negligent misrepresentation" to this context. *Id.* at 416 (Tomljanovich, J., dissenting).

Given the views of the majority of the Minnesota Supreme Court, and the approaches taken by other Courts on the issue before us, prudence counsels that we adhere to the Court's rationale in *Smith,* and decline the Plaintiff's invitation to determine the viability of the tort of negligent misrepresentation which did not involve the risk of physical harm. Here, as in *Smith,* the Plaintiff demonstrably fails to meet one of the elements of the cause of action. Without a colorable factual showing, that the elements of the proposed claim are satisfied, we have no occasion to predict, in some advisory role, how the laws of this State should be expanded, without traversing the "case or controversy" proscriptions of Article III to the United States Constitution.[10]

The Plaintiff has conceded, in response to an Interrogatory, and at her deposition, that she did not suffer any physical injury as a result of Parson's assaults. *Pl.'s Answers to Leisure Hills Interrogatories,* No. 11, *Roby Aff., Ex.* C; *Grozdanich Depo.* at 148–49,

192–93. The existence of a physical injury to the Plaintiff is a necessary element of a claim, based upon Section 311 of the Restatement (Second) of Torts. See, *Smith v. Brutger Cos.,* supra at 413. The Plaintiff only claims to have suffered an emotional injury. Emotional injury, we believe, does not fall within the purview of the "physical harm" which is essential to a claim under the Restatement. See, *Brogan v. Mitchell Int'l, Inc.,* supra at 185, 229 Ill.Dec. 503, 692 N.E.2d 276 (Restatement (Second) of Torts § 311 does not apply to claims of emotional injury). Assuming, without deciding, that the negligent misrepresentation claim, as stated in Section 311, is viable under Minnesota law, the Plaintiff has not shown that Leisure Hills' reasonable reliance on the misrepresentations, were the proximate cause of any physical injury. See, *Smith v. Brutger Cos.,* supra at 413. We dismiss Count IX.

c. *Negligent Failure to Warn.* In Count X of her Complaint, the Plaintiff contends that UMC–M breached a common law duty to warn Leisure Hills about Parson's potential for sexually assaultive behavior, and that proximately resulted in her injury.

■■■■ i. *Standard of Review.* Deeply rooted in Minnesota law is the principle that an affirmative duty to warn, or to otherwise protect another from harm that is caused by the conduct of a third party, only arises when the harm is foreseeable, and when a special relationship exists between the parties. *H.B. v. Whittemore,* 552 N.W.2d 705, 707 (Minn. 1996), citing *Delgado v. Lohmar,* 289 N.W.2d 479, 484 (Minn.1979); *Harper v. Herman,* 499 N.W.2d 472, 473 (Minn.1993); see also, *Restatement (Second) Torts § 314* (1964) ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). "Generally, a special relationship giving rise to a duty to warn is only found on the part of common carriers, innkeepers, possessors of land who hold it open to the public, and persons who have custody of another

---

**10.** For the same reason, we need not certify the question to the Minnesota Supreme Court, as suggested by UMC–M.

person under circumstances in which that other person is deprived of normal opportunities of self-protection." *H.B. v. Whittemore*, supra at 708.

■ ii. *Legal Analysis.* In examining the scope of UMC–M's duty to Leisure Hills, we are mindful of Judge Cardozo's observation that "[t]he risk reasonably to be perceived defines the duty to be obeyed." *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 100 (N.Y.1928). There can be little dispute that, by virtue of UMC–M's knowledge of Parson's past acts of sexual misconduct, which involved its patients and staff members, his future sexual assaults, on some person, were foreseeable to UMC–M. Foreseeability, however, is only half of the equation in a duty-to-warn claim, as a foreseeable risk does not, of itself, impose an affirmative duty to prevent another's misconduct. *Johnson v. State*, 553 N.W.2d 40, 49 (Minn.1996).

Over and above the foreseeability of the danger, there must be some special relationship, between UMC–M and Leisure Hills, that generates a duty to warn. The question presented is whether a former employer has a special relationship with a prospective employer, such that public policy would support the imposition of an affirmative duty to warn about the dangers posed by the employee in question. Of course, a former employer would, ordinarily, possess direct knowledge about its past employees, that would not be available to a prospective employer, except upon inquiry. It does not follow, however, that, absent the former employer's knowledge, the new employer "is deprived of normal opportunities of self-protection." *H.B. v. Whittemore*, supra at 708. If the former employer, without more, should refuse to disclose information about the employee's prior bad acts, it would seem implausible that the prospective employer would be lulled into a false sense of security by that silence, alone.[11] In our view, the relationship between UMC–M and Leisure Hills, as to a job reference check, is not a "special relationship" that would evoke an affirmative duty to

warn of Parson's propensities under Minnesota law.

The Plaintiff argues that Leisure Hills and UMC–M had a special relationship because they had agreed to transfer patients, according to the patients' health care needs. Hence, the Plaintiff contends, the facilities shared responsibility over certain patients should engender a reciprocal obligation to assure that the patients continue to receive care from competent staff, even while entrusted to the other facility. Such an argument extends the meaning of "special relationship" far beyond the limits prescribed by the Minnesota Courts. Again, there is nothing that suggests that Leisure Hills, or any nursing facility that has a patient-sharing relationship with another, does not have at its disposal the adequate means of determining the character and qualities of new hires. Merely because Parson appears to have "slipped through the cracks" of Leisure Hills' screening process, does not *ipso facto* require that public policy burden a former employer with an affirmative duty of disclosure. The relationship between UMC–M and Leisure Hills is, in the final analysis, at arm's length, and is not the sort of heightened fiduciary relationship that creates an affirmative duty to warn.

Therefore, finding no responsible basis for the Plaintiff's claims against UMC–M, we grant its Motion for Summary Judgment on Counts VIII, IX, and X, of the Plaintiff's Complaint.

3. *Leisure Hills' Cross–Claim against UMC–M.* Leisure Hills' Cross–Claim for indemnification is based on legal theories that, with the exception of the Plaintiff's negligence *per se* claim, mirror those that the Plaintiff had advanced against UMC–M. Having just addressed the issue, in the context of the Plaintiff's action, we do not reiterate our analysis of Leisure Hills' negligent failure to warn claim. Leisure Hills' negligent misrepresentation claim, however, seeks redress for pecuniary loss, as opposed to physical harm, and does not face the obstacles that defeated the Plaintiff's paralleling

---

11. If, of course, the former employer volunteers information about a former employee, the law may impose a duty to supply the listener with a

complete picture, in order to avoid misleading the other party. See, *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 288 (Minn.1992).

claim. Accordingly, the Cross–Claim will rise or fall upon the existence of a genuine issue of material fact, which would thereby present a triable issue on the elements of negligent misrepresentation.

■ a. *Standard of Review.* The elements of a claim of negligent misrepresentation are: 1) the defendant owes the plaintiff a duty of care in obtaining or communicating information; 2) the defendant supplied false information in breach of that duty of care; 3) the plaintiff justifiably relied on the false information; and 4) the plaintiff was damaged as a result. *Masepohl v. American Tobacco Co.,* 974 F.Supp. 1245, 1251 (D.Minn. 1997); see also, *Bonhiver v. Graff,* 311 Minn. 111, 248 N.W.2d 291, 298–99 (Minn.1976); *Florenzano v. Olson,* 387 N.W.2d 168, 174 n. 3 (Minn.1986).[12]

■ b. *Legal Analysis.* At the outset, we note that UMC–M does not challenge the proposition that, in undertaking to provide Leisure Hills with a reference, and in volunteering information about Parson's qualities as a nurse, it incurred a duty to use reasonable care to avoid disclosing factually misleading information. It is well-settled that, "even if one has no duty to disclose a particular fact, if one chooses to speak he must say enough to prevent the words from misleading the other party." *M.H. v. Caritas Family Servs.,* 488 N.W.2d 282, 288 (Minn.1992), citing *Newell v. Randall,* 32 Minn. 171, 19 N.W. 972, 973 (Minn.1884). Additionally, a duty to disclose facts may exist "when disclosure would be necessary to clarify information already disclosed, which would otherwise be misleading ***." *Id.,* citing *L & H Airco, Inc. v. Rapistan Corp.,* 446 N.W.2d 372, 378 (Minn.1989); see also, *Randi W. v. Muroc Joint Unified Sch. Dist.,* supra at 593 (unqualifiedly positive employment recommendation, despite knowledge of employee's past sexual improprieties, actionable as negligent misrepresentation).

As we construe it, UMC–M's defense to the merits of the negligent misrepresentation are twofold. First, UMC–M argues that Leisure Hills did not justifiably rely upon the letter of reference, or upon Jamar's words of recommendation, as expressed in her telephone conversation with Skaudis, on January 8, 1996. Second, UMC–M insists that it was bound to adhere to the confidentiality agreement, which was entered by UMC–M, Parson, and Parson's labor union, and that Minnesota's public policy, which favors settlement agreements, would not impose a duty of truthful disclosure under these circumstances.

■ Here, our analysis is guided by the timing of the representations and by the purportedly reliant acts. It is undisputed that no one from Leisure Hills actually saw the letter of reference, which UMC–M issued, until after Parson had assaulted the Plaintiff. As a result, our focus is necessarily drawn to the content of the telephone conversation between Skaudis and Jamar. Jamar made the purportedly misleading statements on the afternoon of January 8, 1996—three days after Skaudis had offered Parson the position—and several hours after he started his first day of work. UMC–M points out, convincingly we find, that a claim of after-the-fact reliance is unavailing, as a matter of Minnesota law. See, *Rien v. Cooper,* 211 Minn. 517, 1 N.W.2d 847, 853 (Minn. 1942) ("Fraud cannot be predicated upon a representation made subsequent to the act claimed to have been induced thereby.").

■ The only viable claim of reliance, which Leisure Hills retains, is that, in reliance upon Jamar's praise of Parson, and her failure to disclose his past sexual misconduct, Leisure Hills did not terminate his employment while Parson was on probationary status, such that his employment was terminable at will. We believe that a reasonable Jury could conclude that Leisure Hills would

**12.** The Minnesota Courts have followed the Restatement (Second) of Torts § 552 (1977), which provides as follows:

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

have terminated Parson's employment, before his sexual assaults upon the Plaintiff, if UMC–M had not provided a purportedly incomplete and, therefore, misleading recommendation to Leisure Hills, on January 8, 1996.

■ UMC–M also suggests that Leisure Hills' reliance was not justified, because Jamar had given them a "red flag" when she mentioned that Parson had difficulties with "employee issues." Under these circumstances, UMC–M contends, Leisure Hills had a duty to independently investigate the truth, or the falsity, of the representations provided, and could not blindly rely upon representations whose accuracy could have been ascertained upon further investigation. While, perhaps, true, that is not the law of Minnesota. In this jurisdiction, a party is justified in relying upon a false representation, even though he or she might have learned of its falsity upon investigation, unless the falsity is obvious. See, *City of Coon Rapids v. Suburban Engineering, Inc.*, 283 Minn. 151, 167 N.W.2d 493, 496 (Minn.1969); *Spiess v. Brandt*, 230 Minn. 246, 41 N.W.2d 561, 566 (Minn.1950); *Jones v. Kvamme*, 430 N.W.2d 188, 193 (Minn.App.1988), rev'd in part on other grounds, 449 N.W.2d 428 (Minn.1989).

■ We cannot accept UMC–M's argument that, as a matter of law, Skaudis was not justified in relying upon Jamar's assessment of Parson as a good nurse, merely because of the mention of his difficulty in handling "employee issues." Ultimately, whether the reliance was justified, or reasonable, is an issue of fact, for the Jury to resolve. See, *Hanks v. Hubbard Broadcasting, Inc.*, 493 N.W.2d 302, 310 (Minn.App. 1992), rev. denied (Feb. 12, 1993). As a consequence, a genuine issue of material fact exists as to whether Leisure Hills did, in fact, rely upon Jamar's recommendation, and whether that reliance, if it is found to exist, was justified under the circumstances.

■ Lastly, we reject, as meritless, UMC–M's position that its confidentiality agreement with Parson should operate as a defense to a claim of negligent misrepresentation. We can accept that Minnesota law favors the settlement of claims without litiga-

tion, see, e.g., *Johnson v. St. Paul Insurance Co.*, 305 N.W.2d 571, 573 (Minn.1981), and that confidentiality agreements are often instrumental in effectuating that purpose. We do not believe, however, that, in order to adhere to the confidentiality agreement, it was necessary for UMC–M to commit what might amount to a tort. Nothing in the confidentiality clause of the Resignation Provision directed UMC–M to disseminate laudatory statements about Parson's qualities, as a health care professional, to prospective employers. Moreover, if we construed the Resignation Agreement to authorize the infliction of an alleged tortious injury upon third persons, then the contract would be void, in our considered judgment, as against public policy. See, *Independent Sch. Dist. No. 877 v. Loberg Plumbing & Heating Co.*, 266 Minn. 426, 123 N.W.2d 793, 799 (Minn. 1963) (a contact violating law or public policy. is void); see also, *Anabas Export Ltd. v. Alper Indus., Inc.*, 603 F.Supp. 1275, 1276 (S.D.N.Y.1985) ("a court will not enforce a contract to commit a tort."); *Shea v. Grafe*, 88 Wis.2d 538, 274 N.W.2d 670, 673 (Wis. 1979) (agreement that " 'contemplates or necessarily involves the defrauding or victimizing of third persons as its ultimate result' is void as against public policy."), quoting *Twentieth Century Co. v. Quilling*, 130 Wis. 318, 110 N.W. 174 (Wis.1907). UMC–M was free to enter into a confidentiality agreement with Parson, but we will not transform its contractual duty of silence into a shield from liability for statements made, notwithstanding the pledge of confidence, that might well amount to actionable misrepresentation. Therefore, we deny Summary Judgment on Leisure Hills' Cross–Claim for indemnification, based upon its allegations of negligent misrepresentation.

NOW, THEREFORE, It is—

ORDERED:

1. That Leisure Hills Health Center's and St. Francis Health Center's Motion for Summary Judgment [Docket Nos. 27, 30] is GRANTED, in part.

2. That Counts II, III, IV, VI, and VII of the Plaintiff's Complaint are dismissed.

992

3. That Count V is dismissed only with respect to the Plaintiff's claim for negligent supervision, and to claimed negligent acts or omissions occurring after May 22, 1996.

4. That University Medical Center—Mesabi's Motion for Judgment on the Pleadings or Summary Judgment of the Complaint [Docket No. 17, Part 1] is GRANTED.

5. The Plaintiff's claims against University Medical Center—Mesabi [Counts VIII, IX, and X] are dismissed.

6. That University Medical Center—Mesabi's Motion for Judgment on the Pleadings or Summary Judgment [Docket No. 17, Part 2] of Leisure Hills Health Center's Cross–Claim is GRANTED, in part.

7. Leisure Hills Health Center's Cross–Claim, insofar as it alleges that the University Medical Center—Mesabi violated its affirmative duty to warn, is dismissed.